**Tracey Woodson MARTIN, Plaintiff,**

v.

**The ORTHODONTIC CENTERS OF SOUTH CAROLINA, INC., a/k/a the Orthodontic Center, a/k/a The Orthodontic Centers of America, Inc., and Orthodontic Center of Charleston Defendants.**

No. 2:97–2931–23.

United States District Court,
D. South Carolina,
Charleston Division.

March 4, 1999.

Calvin Rouse, August, GA, for Plaintiff.

Allan R. Holmes, Gibbs & Holmes, Charleston, SC, for Defendants.

## ORDER

DUFFY, District Judge.

This matter is before the court upon the magistrate judge's recommendation that summary judgment for Defendants be denied. This record includes a Report and Recommendation of the United States Magistrate made in accordance with 28 U.S.C. § 636(b)(1)(B) in which the magistrate judge recommended denial of the defendants' motion for summary judgment. However, upon further inquiry, this court grants the motion.

## I. REVIEW OF THE MAGISTRATE'S REPORT

A party may object, in writing, to a magistrate's report within ten days after being served with a copy of that report, 28 U.S.C. § 636(b)(1). Three days are added to the ten-day period if the recommendation is mailed rather than personally served. The magistrate's report and recommendation was filed on January 29, 1999. Defendants filed timely objections on February 11, 1999.

This court is charged with conducting a *de novo* review of any portion of a magistrate judge's report to which a specific objection is registered and may accept, reject, or modify, in whole or in part, the recommendations contained in that report. 28 U.S.C. § 636(b)(1).

## II. SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.1995) (*quoting Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990)). "Mere unsupported speculation ... is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Business and Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir.1995). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

## III. FACTUAL BACKGROUND

Tracey Woodson Martin filed this action against her former employer, Orthodontics of America and Orthodontic Center of Charleston, alleging she was terminated from her position as a part-time orthodon-

tic assistant on December 7, 1995 because of her race. She filed timely charges with the Equal Employment Opportunity Commission which issued a right to sue letter on June 9, 1997. On September 24, 1997, this suit was timely filed.

Dr. Niremblatt managed and served as the Center's orthodontist. Martin began working as a part-time technical assistant on September 26, 1994. She was the only black employee out of at least six employees. Shortly thereafter, the defendant sent Martin to Florida for a two-week training session in order to familiarize her with the defendant's business practices, which included training for the office manager's duties. In January of 1995, the office manager was fired, and Martin assumed many of those responsibilities as she was the only employee who had training in those areas. Martin was promoted to full-time front desk assistant on February 1, 1995, and given a one dollar per hour raise and benefits. Later that month, Defendant hired a white female, Randi Clements, as the office manager. Martin and the other employees undertook the responsibility of showing Clements how to perform many of her duties. By November of 1995, Clements was fully performing her managerial duties and Martin was again doing part-time technical assistant work.

Dr. Niremblatt first disciplined Martin on June 23, 1995 for unprofessional behavior after she and another co-worker had an argument in hearing range of a patient and new employee, and for failing to clock out on her time card. After the confrontation Martin left the office for approximately an hour without indicating it on her time card. Niremblatt gave Martin a written warning and put her on probation for two weeks pending an improvement in her attitude. Martin's attitude improved, and the probation was lifted.

In July of 1995, Martin alleges that while she was on vacation two of her co-workers, Julie George and Jackie Wilson, telephoned her and told her that other employees had called her racially inflammatory names: Tammy Reynolds said that she was going to come into the office with a white sheet; Cheri Lewis used the word "nigger," but Martin cannot recall whether or not it was used at work; and finally, the office manager, Clements, had supposedly called Martin "a black bitch" and other racially inflammatory names to other workers while at lunch one day. Clements allegedly told Wilson that "they wanted Tracey out of the office," and said that the practice was losing money because they were treating too many black patients. A few weeks after her return from vacation, Martin claims that she complained to the doctor about the slurs and that he did not seem concerned. Dr. Niremblatt denies Martin made any such complaint.

In August, Martin contacted the Orthodontic Centers of America and requested a transfer out of the Charleston office. She said that she wanted to be closer to home and complained that the Charleston office was unprofessional. However, she did not complain, or even mention, that she considered her working environment to be racially hostile.

On November 3, 1995, Dr. Niremblatt approved a 50¢ pay raise for Martin which was to be effective November 13, 1995. Also, on November 13, 1995, Dr. Niremblatt gave Martin a verbal warning because she used profanity towards him and was insubordinate. Apparently, there was some dispute between two employees and when Niremblatt asked Martin about it she responded: "Don't try to drag me into that shit." Martin denies that her comment was directed towards Niremblatt.

Again on November 18, 1995 Dr. Niremblatt wrote out an incident report when Martin came in thirty minutes late that morning. The report stated that Martin responded rudely to the doctor's inquiry as to why she was late and that he told her that her unexcused tardiness can result in termination.

On December 4, 1995, Dr. Niremblatt completed another incident report which indicated that Martin was late to work again, that she had still not signed the new employee manual which had been distributed months before, and that she had an "attitude" about the matter. After lunch Martin developed a migraine headache and did not return to work. Martin telephoned Niremblatt around 1:30 p.m. to tell him that she would not return for the rest of the day. Around 9:00 p.m. that evening, Martin telephoned Niremblatt to tell him she had a doctor's appointment and would not be coming into work the following day. Martin did not come to work on December 5th, but her mother telephoned the office around 10:00 p.m. on the 5th to say that she would not be in on the following day, December 6, 1995. Martin did not come into work on December 7, 1995, at which time Niremblatt telephoned and spoke with Martin's mother and asked that Martin call him. She did not do so. About 9:00 p.m. that evening, Niremblatt telephoned Martin and fired her effective December 4, 1995 for insubordination, tardiness, and refusal to sign the employee manual in a timely manner.

It is uncontested that Dr. Niremblatt was in charge of the Charleston practice and made the decisions to hire, discipline, and fire Martin. Dr. Niremblatt neither made nor witnessed any of the alleged slurs or racial remarks.

### IV. ANALYSIS

Martin asserts that she was fired because of her race in violation of Title VII of the Civil Rights Act of 1964. "It shall be an unlawful employment practice for an employer ... to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.... " 42 U.S.C. § 2000e-2(a). Discriminatory discharge can be proved by showing disparate treatment through the use of either direct or circumstantial evidence. *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The only direct evidence Martin offers of discriminatory intent are the July 1995 comments allegedly made by co-workers and the office manager, Randi Clements. Martin claims that she complained to Dr. Niremblatt, but he failed to respond. Nevertheless, remarks standing alone are not enough to establish discriminatory intent. " 'Stray remarks' and isolated statements by those unconnected to the final decision-making process and to the negative employment action are not sufficient to establish discriminatory animus." *Bodoy v. North Arundel Hosp.*, 945 F.Supp. 890, 895 (D.Md.1996) (national origin discrimination) (citations omitted); *see O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 549 (4th Cir.1995), *rev'd on different grounds* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Robinson v. Montgomery Ward & Co., Inc.*, 823 F.2d 793, 797 (4th Cir.1987).

The magistrate concluded that because there was a factual dispute regarding Clement's decision-making authority, the circumstantial evidence model was appropriate. However, the circumstantial evidence model is appropriate in this case because the plaintiff has failed to show discrimination by direct evidence. Clements had no authority to discipline, hire or fire employees and never performed any of those actions.

While Martin has failed to present direct evidence, she is entitled to prove discrimination under the *McDonnell Douglas* burden shifting analysis applicable to proof by circumstantial evidence. Pursuant to *McDonnell Douglas*, plaintiff has the initial burden of proof in establishing a *prima facie* case of discrimination by a preponderance of the evidence. 411 U.S at 802, 93 S.Ct. 1817. Plaintiff's burden of establishing a *prima facie* case is not an onerous one, but merely a threshold burden. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

If plaintiff meets this initial burden of proof, the burden will shift to defendant "to articulate some legitimate, nondiscriminatory reason" which would support a finding that unlawful discrimination was not the cause of the employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. This burden requires the defendant to "raise a genuine issue of fact as to whether it discriminated against plaintiff." *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089.

Once this burden of production is satisfied, the presumption created by the *prima facie* showing "'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination." *Id.* (*quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2746–49, 125 L.Ed.2d 407 (1993)). Plaintiff must show evidence that discrimination was the true reason for the discharge, and it is not enough for plaintiff to assert that the defendant's reasons are not credible. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason [for the termination]." *Id.* at 515, 113 S.Ct. 2742; *see also Vaughan v. Metra-Health Cos., Inc.,* 145 F.3d 197, 202 (4th Cir.1998)(discussing the "pretext-plus" standard in the age discrimination context). The plaintiff must demonstrate that, as between race and the articulated reason, race was the more likely reason for the dismissal. *Vaughan,* 145 F.3d at 200. In *Vaughan,* the court stated:

> to survive a motion for summary judgment under the McDonnell Douglas paradigm the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action.

145 F.3d at 201–202.

■ A *prima facie* case of discriminatory discharge under Title VII is established if plaintiff proves: (1) she was a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) in spite of her qualifications and performance, she was fired; and (4) the position remained open to similarly qualified applicants after her dismissal. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989).

■ The magistrate concluded that Martin met all the elements of the *prima facie* case. The only element to which the defendants object is that Martin was "qualified for her job and her performance was satisfactory." Specifically, the defendants object that the magistrate relied on evidence that Martin was given raises regularly during her employment as the basis for the inference that she was working up to the employer's legitimate expectations. Due to the short period that Martin worked for the defendant (approximately one (1) year), no pattern of employee evaluations exists from which to draw. It is also unclear if the defendant regularly conducts standard evaluations. Martin did receive an "above average" evaluation dated April 27, 1995. However, this clearly falls well before the time period in which Martin began exhibit performance and attitude problems. She also received three pay raises during her tenure, the last of which became effective on November 13, 1995, the same day as one of the disciplinary warnings. There is nothing in the record to indicate that any of the discipline matters actually affected Martin's day-to-day job duties. None of Niremblatt's criticisms concerned Martin's actual job performance. While the evaluation and the pay raises all occurred prior to the majority of Martin's disciplinary problems, these facts allow the inference that Martin was performing her job satisfactorily.

Once the plaintiff makes out a *prima facie* case of discriminatory discharge, the burden shifts to the defendant to articulate a non-discriminatory justification for the employment action. The defendant articulated its legitimate, nondiscriminatory reason for her termination-"insubordination, tardiness, and refusal to sign the employee agreement in a timely manner." (Def's Ex. R). The record reveals a pattern of tardiness, inappropriate conduct, and insubordination by Martin during the last months of her employment at the Orthodontic Center.

In order to meet the ultimate burden of creating an inference of discrimination, Martin must not only show that the proffered justifications for the discharge were false, but she must also produce sufficient evidence that her race was the real reason that she was discharged. *Vaughan,* 145 F.3d at 202. Martin does not deny that she was tardy; however, she contends that she alone was singled out for discipline. Julie George was also reprimanded for tardiness on April 12, 1995. Niremblatt fired Elizabeth Reynolds on April 18, 1995 for excessive tardiness, poor appearance, and unprofessionalism. Ms. George also stated in her affidavit that she was late, but not written up, on one of the same days that Martin was written up for being late. Martin alleges that Tammi Reynolds was late on November 18, 1995, but was not disciplined. However, unlike Martin, Tammy Reynolds had called the office to let them know she would be late due to traffic conditions.

Martin also claims that the fact that she was the only person disciplined for the June "cussing" incident is evidence of pretext. However, Martin was not disciplined for arguing with her co-worker, but for using profanity at or in front of Dr. Niremblatt. None of the other employees involved in the argument cussed at or around the doctor. In addition, after that incident Martin left the office for approximately an hour without clocking out.

Lastly, Dr. Niremblatt cited that Martin was insubordinate in failing to follow the leave procedure regarding her absences of December 4 to December 7, 1995 leading up to her termination. Niremblatt made several attempts to contact Martin to inquire as to her illness, and expected date of return. Although there is some dispute regarding whether or not and at what time either Martin or her mother returned the doctor's telephone calls, Niremblatt was unsatisfied with Martin's responses and failure to keep him informed regarding her return to work. Even in the light most favorable to the plaintiff, a factual dispute surrounding the events leading up to Martin's termination does not mandate a finding of pretext.

There is a substantial factual basis that the articulated, non-discriminatory reasons were credible. However, even assuming the reasons for her discharge were false, Martin must also produce evidence that she was discharged because she was black. The only evidence that presents a possibility that the discharge was based on her race and not her discipline problems and failure to follow the leave policy during her migraine episode are the comments allegedly made by her co-workers and the office manager in July of 1995. Stray comments made by persons other than the decision-maker do not amount to evidence of discrimination. *Bodoy,* 945 F.Supp. at 895; *see also Boyd v. State Farm Ins. Companies,* 158 F.3d 326, 330 (5th Cir. 1998) (holding that absent a causal link between supervisor's racial isolated remarks and employer's decision not to promote employee, stray remarks cannot support a verdict for race discrimination).

The alleged comments were made four months prior to the discharge; it is unclear if the alleged comments were made in the office. The affidavits of Julie George and Jackie Wilson support the plaintiff's allegations that racially derogatory comments were made about Martin. Both George and Wilson stated that they heard the racial remarks made about Martin. However, Randi Clements, the manager and allegedly one of persons making racial comments, denies that she ever

heard any racially derogatory comments. Martin contends that she complained to Dr. Niremblatt about the comments, but that he just "threw his hands up" like he did not want to hear about it. (Martin Depo. at 151). Niremblatt denies that Martin ever complained about any racial comments. Furthermore, no evidence exists that any employee or manager ever addressed any racially derogatory remarks directly to Martin. None of the remarks bear any causal connection to Niremblatt's decision to discharge Martin on December 7, 1995.

The magistrate concluded that taken in the light most favorable to the plaintiff, Dr. Niremblatt's failure to respond to Martin's complaint, in addition to Clements' alleged belief that, due to Martin's employment at the Center, there were too many black, low-income patients which resulted in loss of business supported a denial of summary judgment. However, even if Niremblatt failed to respond to the complaint, such unrelated and remote comments cannot be the basis for finding that race was more likely the reason for Martin's termination than her tardiness, insubordination and failure to sign the employee manual. None of the comments reported were made after July of 1995–four months prior to Martin's termination. These disputed comments, allegedly made by persons without the authority to hire, discipline, or fire Martin cannot alone be the basis for concluding that the real reason Dr. Niremblatt fired Martin was due to her race, and not her failure to follow leave policy, her tardiness, and unprofessional conduct.

### V. CONCLUSION

It is, therefore,

**ORDERED**, for the foregoing reasons that Defendants' motion for summary judgment be **GRANTED**,

**AND IT IS SO ORDERED.**