**Ann EDDY, Lavonna Eddy, Vernon Eddy Kathy Lander and Mark Lander, Plaintiffs,**

v.

**WAFFLE HOUSE, INC., Defendant.**

**No. 2:03–2183–18.**

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 7, 2004.

---

Jerry Rickson, Charleston, Thomas J. Barton, John F. Hunsicka, Philadelphia, PA, for plaintiffs.

Wade H. Logan, Charleston, S.C., Narey E. Raguse, Atlanta, GA, for defendant.

## ORDER

NORTON, District Judge.

This matter comes before the court on defendant's Motion for Summary Judgment. Plaintiffs, Ann Eddy,[1] Lavonna Eddy, Vernon Eddy, Kathy Lander and Mark Lander, all of whom are African–American, have brought federal and state claims for racial discrimination against defendant, Waffle House, Inc. ("Waffle House"). Collectively, plaintiffs allege they were discriminated against and denied service at Waffle House's Walterboro, South Carolina location because of their

---

1. Ann Eddy died on January 31, 2004. As noted by plaintiffs' counsel at the court's hearing of the matter, her claim is no longer being pursued.

race. Waffle House now moves for summary judgment on all of plaintiffs' claims.

## I. Standard of review

Summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries its burden of showing that there is an absence of evidence to support a claim, then the non-moving party must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Id.* at 324–25, 106 S.Ct. 2548. An issue of fact is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "material" only if establishment of the fact might affect the outcome of the lawsuit under the governing substantive law. *Id.* When determining whether there is an issue for trial, the court must view the inferences to be drawn from the underlying facts in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990).

## II. Factual Background

In the light most favorable to plaintiffs, the allegations forming the basis of their complaint are as follows. On July 6, 2000, plaintiffs stopped to eat at a Waffle House restaurant in Walterboro, South Carolina as they were returning home from a funeral in Georgia. After parking, Ann Eddy, Lavonna Eddy, Vernon Eddy and Mark Lander entered the restaurant while Kathy Lander remained outside finishing an ice cream cone. Ann Eddy, Lavonna Eddy and Vernon Eddy immediately seated themselves inside the restaurant, and Mark Lander followed behind after holding the door open for the group. As Mr. Lander made his way to the group's table, he alleges that he heard a female voice clearly announce: "We don't serve niggers in here." (Pl.'s Response at 3). Mr. Lander then "snapped around to look at the person who made the statement and saw two white women at the counter 2–3 feet away wearing Waffle House uniforms." (Pl.'s Response at 3). While Mr. Lander did not see who made the comment, he is certain that it came from one of these female employees. Mr. Lander then joined the group at their table and a waitress approached them and asked, "May I help you?" [2] At that point, Mr. Lander told the others, "I don't believe we want to—want to eat here .... When we walked in the door, they said they don't serve niggers here." (Pl.'s Response at 3). The group then got up and left the restaurant. As they were leaving, the four of them met Kathy Lander at the door and Mr. Lander told her what he heard and why they were leaving. Mrs. Lander then called the customer complaint line listed on the store-front window from her cellular phone to file a complaint. As she did this, Mrs. Lander went back into the restaurant to ensure that the employees behind the

---

**2.** It is clear from the evidence presented that this waitress could not have made the offensive comment. Mr. Lander is convinced that the remark was made by an employee behind the restaurant's counter. (Mark Lander Dep. at 149).

counter heard her making the complaint. According to plaintiffs, the restaurant's manager, Cheryl Wilson, observed them entering the restaurant and leaving only moments later. Apparently, after noticing this was out of the ordinary, Wilson asked the other three employees on duty what happened. They answered that one of the plaintiffs told the waitress who attempted to serve them that she "asked too many questions." (Pl.'s Response at 5; Kathy Lander Dep. at pp. 64–65). While Wilson has since stated that she believed this was an "odd" response which "just didn't sound right," she did not speak to plaintiffs as they entered or exited the restaurant. (Pl.'s Response at 5). Four days after the incident occurred, on July 10, 2000, a Waffle House case manager called Mrs. Lander to inform her that her complaint was being investigated. Each plaintiff thereafter received a letter reiterating that the matter was being investigated as well as a $20 coupon for a complimentary meal at any Waffle House location. This was the last contact any plaintiff had with a Waffle House employee or representative prior to filing this action.

As noted, plaintiffs' complaint alleges that they were denied service on the basis of their race and plaintiffs have filed federal and state law claims against Waffle House for racial discrimination. Specifically, plaintiffs assert violations of 42 U.S.C. § 1981 and 42 U.S.C. § 2000a and S.C.Code Ann. § 45–9–10 and S.C.Code Ann. § 45–9–30. Waffle House has moved for summary judgment on each of these claims.

### III. Discussion

**a. Plaintiffs' federal claims: 42 U.S.C. § 1981 and 42 U.S.C. § 2000a**

**1. 42 U.S.C. § Section 1981**

■ Section 1981 grants all persons within the jurisdiction of the United States "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). While this statute is most commonly used within the employment context, it has repeatedly been used within the service arena. Both parties agree that to prevail under a § 1981 claim a plaintiff must prove that: "(1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute; in this case, the making and enforcing of a contract." *Bobbitt by Bobbitt v. Rage, Inc.*, 19 F.Supp.2d 512, 517 (W.D.N.C.1998) (quoting *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir.1997)).

■ Intentional discrimination may be shown by direct evidence, but in most cases it must be shown by circumstantial evidence. When a plaintiff relies upon circumstantial evidence to prove his or her case, the plaintiff must satisfy the well-known heightened burden shifting analytical framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, a prima facie case of discrimination must first be established. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). In order to do this, a plaintiff must establish the following criteria:

(1) he is a member of a protected class; (2) he sought to enter into a contractual relationship with the defendant; (3) he met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) he was denied the opportunity to contract for goods or services that was otherwise afforded to white customers.

*Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir.2004). If the plaintiff is able

to satisfy these requirements, the defendant "may [then] respond by producing evidence that it acted with a legitimate, nondiscriminatory reason, and then the plaintiff may adduce evidence showing that the defendant's proffered reason was mere pretext and that race was the real reason for the defendant's less favorable treatment of plaintiff." *Id.* (citing *Hawkins,* 203 F.3d at 278). As noted above, however, this heightened framework is inapplicable in the "rare" event, *Wilkins v. Denamerica Corp.,* No. 1:99CV102–T, 2001 WL 1019698, *8 (W.D.N.C. May 5, 2001), that a plaintiff is able to come forward with direct evidence of intentional discrimination.

Waffle House contends that plaintiffs are unable to offer any direct evidence of racial discrimination. Quoting this court's decision in *Martin v. Orthodontic Centers of S.C., Inc.,* 93 F.Supp.2d 682, 685 (D.S.C. 1999), Waffle House argues that, standing alone, "stray" remarks or isolated statements are not direct evidence "sufficient to establish discriminatory animus." In *Martin,* which involved allegations by the plaintiff that her fellow employees made racial remarks against her, this court observed that:

> [R]emarks standing alone are not enough to establish discriminatory intent. Stray remarks and isolated statements by those unconnected to the final decision-making process and to the negative employment action are not sufficient to establish discriminatory animus.... [T]he circumstantial evidence model is appropriate in this case because the plaintiff has failed to show discrimination by direct evidence.

*Martin,* 93 F.Supp.2d at 685. Contrary to Waffle House's argument, the same cannot be said in this instance. In *Martin,* the co-workers did not possess any authority over the plaintiff and their isolated—albeit reprehensible and offensive—comments were insufficient as a matter of law to link any discriminatory intent with the plaintiff's actual employer. By comparison, this case involves a racial epithet allegedly uttered by a counter service employee to a patron. Unlike *Martin,* plaintiffs' allegation therefore implicates someone possessing at least some decision-making authority as the speaker presumably had the ability to refuse to serve plaintiffs.

Furthermore, courts have held that the racial epithet "nigger" is no "stray remark." In *Jones v. City of Boston,* 738 F.Supp. 604 (D.Mass.1990), the court held that:

> Without question, the racial epithet of "nigger" shows an intent to discriminate on the basis of race. That satisfies plaintiff's burden ... under 42 U.S.C. § 1981. It also satisfies plaintiff's burden under 42 U.S.C. § 2000a ... of showing that he was denied equal access to a place of public accommodation on the basis of race. The term "nigger" is intimidating by its very nature and therefore, [the plaintiff] has also sustained his burden of showing a possible civil rights violation under [state law].

*Jones,* 738 F.Supp. at 607; *see also Bailey v. Binyon,* 583 F.Supp. 923, 927 (N.D.Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se.").

It additionally appears that as far as establishing a showing of "discriminatory intent" is concerned, the Fourth Circuit would agree. Although decided in the context of a hostile work environment claim filed under § 1981, in *Spriggs v. Diamond Auto Glass,* the Fourth Circuit observed that: "[f]ar more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African–Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an

unambiguously racial ·epithet such as 'nigger' by a supervisor in the presence of his subordinates." 242 F.3d 179 (4th Cir.2001) (quoting *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993)).

Lower courts within Fourth Circuit have also cited *Spriggs* as supporting the conclusion that this racial epithet, alone, is sufficient as direct evidence of racial discrimination. For example, in *Bynum v. Hobbs Realty,* No. 1:00CV01143, 2002 WL 31444660, 2002 U.S. Dist. LEXIS 21473 (M.D.N.C.2002), the plaintiffs sued a realty company after it refused to release the keys to a beach house to members of the plaintiffs' family prior to their family vacation. The plaintiffs alleged that when they arrived at the summer rental the keys were not in place as promised and a partner of that company refused to provide them with the keys once he saw them and "comment[ed] that he did not rent to 'niggers.'" *Bynum,* 2002 WL 31444660, at \*1, U.S. Dist. LEXIS 21473 at \*5. This individual later denied making the comment and the company moved for summary judgment in its favor. The court, however, denied the defendant's motion with respect to the § 1981 claim because the plaintiffs had "offer[ed] direct evidence of discriminatory intent." The court further held that:

> Direct evidence includes evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested ... decision .... Plaintiffs have proffered sufficient direct evidence—the utterance of an "unambiguously racial epithet" that is "pure anathema" to African–Americans—to survive summary judgment on the[ir] §§ 1981 ... claim[.]

*Bynum,* 2002 WL 31444660 at \*4, 2002 U.S. Dist. LEXIS 21473 at \*10–12 (quoting *Spriggs,* 242 F.3d at 185); *see also Bernard v. Calhoon Meba Engineering*

*School,* 309 F.Supp.2d 732, 738 (D.Md. 2004) ("In particular, [the] use of 'nigger' ... is the essence of despicable racial animus.").

■ In light of these holdings, this court concludes that the racial epithet "nigger," when uttered in the service context, is so offensive and racist both in its connotation and effect that it can have no purpose other than the expression of a racial animus. As a result, the court agrees with plaintiffs that they have produced direct evidence of discriminatory intent. The *McDonnell–Douglas* burden-shifting analysis, therefore, does not apply in this instance.

However, while direct evidence of racial discrimination allows plaintiffs to clear a significant hurdle, it is by no means the end of the matter. As noted in *Baltimore–Clark v. Kinko's Inc.,* 270 F.Supp.2d 695, 698 (D.Md.2003), even where a plaintiff is able to come forth with direct evidence, he or she "[n]evertheless ... is still required to allege facts that are legally sufficient to state a claim under § 1981." Consequently, in addition to showing discrimination, plaintiffs must "allege that [they were] actually denied the ability to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of race-based animus." *Id.* (quoting *Garrett v. Tandy Corp.,* 295 F.3d 94, 100–01 (1st Cir.2002)). In addressing this final question, "[c]ourts [that] have examined discrimination in the retail context under § 1981 have focused on the question of whether a plaintiff's right to contract has been impeded, thwarted or deterred in some way ... or whether special conditions have been placed on a plaintiff's right to contract." *Id.*

Seizing upon this final hurdle, Waffle House contends that because plaintiffs were in fact approached by a waitress and

offered service after they seated themselves, they "cannot prove they were denied the opportunity to make or enforce a contract, or the benefits or enjoyment of Waffle House services, and their claims should be dismissed." (Def.'s Mem. in Supp. at pp. 16–17). In support of this argument, Waffle House cites the decisions of *Bagley v. Ameritech Corp.*, 220 F.3d 518, 521 (7th Cir.2000) and *Mendez v. Pizza Hut of Am., Inc.*, No. 02–C–1819, 2002 WL 31236088 (N.D.Ill. Oct. 3, 2002).

In *Bagley*, the plaintiff entered the defendant's store to purchase a cordless phone. Upon learning that a particular phone was not in stock on the merchandise floor, the plaintiff approached a sales clerk to see if any more were available. The clerk referred him to a sales manager who "loudly responded, 'I will not serve him[,]'" and then made a lewd gesture and walked away, leaving the clerk to help him. The plaintiff subsequently filed a § 1981 racial discrimination claim against the store. The district court, however, granted summary judgment in favor of the store, reasoning:

> that since [the plaintiff] could only show that [the store] interfered with his prospective contractual relations, not with a specific contract that it refused to enter or enforce, neither [the plaintiff's] right to contract ... nor his right to buy personal property was infringed. In other words, the judge found that because [the plaintiff] had not agreed to purchase the phone at the time [the sales manager] told him that she would not serve him, and he did not attempt to buy it after the comment was made, [the plaintiff] could not point to a specific contract that [the store] denied him.

*Id.*, 220 F.3d at 523. Upon review, the Seventh Circuit agreed and held in part that the plaintiff's case failed as a matter of law because he "immediately left the store after hearing the comment without attempting to consummate the transaction with [the sales clerk] or anyone else[.]" *Id.* at 523. The appellate court further observed that while the sales manager's conduct was surely offensive, it was not tantamount to a denial of service. For example, the court noted that the manager did not say, "[w]e will not serve you," nor did she instruct the sales clerk to deny the plaintiff service. Finally, it was clear that the sales clerk offered to assist plaintiff and he even returned to the store later that same day and was able to complete his transaction. In sum, the court concluded that, "[s]ince [the store] was not responsible for terminating the transaction, it did not violate § 1981." *Id.* at 524.

Similarly, in *Mendez* a district court held that,

> [i]t is well settled that a plaintiff cannot maintain a section 1981 claim when the plaintiff was the party responsible for terminating the transaction. This is true even if the plaintiff left the establishment because of what they perceived to be racial animus. A section 1981 claim must allege that the plaintiff was actually prevented, and not merely deterred, from making a purchase or receiving service after attempting to do so ....

*Mendez*, 2002 WL 31236088 at *5.

■ Waffle House argues that the same result should follow here. Specifically, it asserts that because it is undisputed that a waitress approached plaintiffs and said, "May I help you?", plaintiffs are unable to establish a prima facie case of racial discrimination. This court disagrees. First, unlike in this case, both *Mendez* and *Bagley* involved instances where circumstantial evidence was proffered in support of alleged discriminatory animus. In this instance, plaintiffs are able to offer direct evidence of discrimination, which is rare. Second, and as noted earlier, the Fourth Circuit and other courts have observed

that there arguably exists no more offensive or threatening expression of racial animus as the use of the word "nigger." Accordingly, the court agrees with plaintiffs that this epithet, because of its inherent hostility and objectively discriminatory meaning, can amount to an actual denial of service when uttered under certain circumstances.[3]

■ Perhaps anticipating this conclusion, Waffle House offers alternative grounds for summary judgment, arguing that it cannot vicariously be held responsible for its employee's racial remark because such language is obviously "outside of the scope" of her employment in that "it violated Waffle House's policies prohibiting discrimination." (Def.'s Mem. in Supp. at pp. 19–20). In support of this argument, Waffle House points to the decision of *LaRoche v. Denny's, Inc.*, 62 F.Supp.2d 1366 (S.D.Fla.1999). As Waffle House correctly notes, in *LaRoche* the court held that if a reasonable person would "believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability." *LaRoche*, 62 F.Supp.2d at 1373. The argument, therefore, is that because the racial epithet allegedly made here "at best, amounts to the possibility that a server personally refused to serve Plaintiffs[,]" (Def.'s Mem. in Supp. at 19), a reasonable person would not believe that Waffle House would approve of or otherwise facilitate the action because management was not involved.

While this argument is clear on its face, the court is not persuaded because *LaRoche* may no longer be reliable precedent. Indeed, in *Arguello v. Conoco, Inc.*, 207 F.3d 803 (5th Cir.2000), the Fifth Circuit reversed the district court decision upon which the *LaRoche* court relied and held that managerial involvement is not necessary for liability to attach in a discrimination action. In so deciding, the Fifth Circuit observed that while limiting liability largely to the acts of supervisors is appropriate in the employment discrimination arena, the same cannot be said in the public accommodation context because of the ill effects it might have for potential

---

**3.** Such a position is not without precedential support and other courts faced with similar facts have denied a motion for summary judgment. As observed in *Charity v. Denny's Inc.*, No. 98–0054, 1999 WL 544687, 1999 U.S. Dist. LEXIS 11462 (E.D.La. July 27, 1999):

> [I]t is correct that [while most actionable § 1981 claims] involve[ ] situations where a racial minority was outright denied access to or service at a restaurant .... The statute has ... been increasingly expanded in its scope and application. In fact, it could reasonably be said that a customer who enters a restaurant for service is contracting for more than just food. 42 U.S.C. § 1981(b) encompasses "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." Dining in a restaurant includes being served in an atmosphere which a reasonable person would expect in the chosen place. Courts have recognized that the contract formed between a restaurant and a customer does include more than just the food ordered .... This Court concludes that being admitted into a restaurant and ultimately being served does not preclude bringing a § 1981 claim. Indeed, in light of the clear illegality of outright refusal to serve, a restaurant which wishes to discourage minority customers must resort to more subtle efforts to dissuade ... efforts such as slow service, discourteous treatment, harassing comments and gestures and outright racial insults. In determining the scope of civil rights protection, courts must be guided by the holdings of the Supreme Court of the United States that the Civil Rights Act is to be afforded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination.

*Charity*, 1999 WL 544687 at *5, 1999 U.S. Dist. LEXIS at *15–16.

plaintiffs. Specifically, the *Arguello* court held that,

> in a public accommodation case under § 1981, a rule that only actions by supervisors are imputed to the employer would result, in most cases, in a no liability rule. Unlike the employment context it is rare in a public accommodation settings [sic] a consumer will be mistreated by a manager or supervisor. Most consumer encounters are between consumers and clerks who are non-supervisory employees . . . . For all these reasons, we are persuaded that the restrictive rules of respondeat superior . . . do not apply to this case.

*Arguello*, 207 F.3d at 810. The court added that an employer might be held vicariously liable even for racial epithets unexpectedly uttered by its non-supervisory employees under general agency principles where the remarks are made in the normal course of business and while the particular employee is conducting "normal duties." *Id.* In such a situation, "even if [the defendant] is able to show that they could not have expected this conduct by [the employee], the jury is entitled to find that other factors outweigh this consideration." *Id.* Accordingly, to the extent that Waffle House would contend that it may not be held liable for its employee's remarks because they were, at best, working in a service capacity at the time the remarks were made, this argument is rejected.

█ There remains, however, the question of whether each of the plaintiffs were actually denied service by the epithet uttered. As was observed in *Bagley*, 220 F.3d at 522, irrespective of what type of evidence is offered for purposes of showing discriminatory intent—direct or circumstantial—a § 1981 action nevertheless boils down to the question of whether a service provider refused to contract with a plaintiff. On the one hand, cases such as *Bagley* and *Mendez* make it clear that

were there not some limitation on the manner in which a plaintiff is able to bring a § 1981 claim, then businesses, large and small, would potentially be subject to liability for every randomly uttered racial remark made within the confines of the public accommodation arena. As these decisions make clear, there must exist some reasonable limitation upon when an offended minority may sue. However, other cases such as *Charity, Bynum*, and *Spriggs* demonstrate that there are many instances where the single use of a racial epithet can amount to an effectual refusal of service, giving rise to an actionable claim under § 1981. As the precedent discussed herein reveals, this is especially true with respect to the word "nigger."

After careful consideration of the factual record and the respective arguments of the parties, the court concludes that, collectively, these decisions do not precisely address the factual particularities of this case. It is undisputed that only Mr. Lander heard someone say, "We don't serve niggers in here." Indeed, Mrs. Lander found out what happened inside the restaurant only as the others passed her in the doorway on their way out. Additionally, had Mr. Lander not told those plaintiffs who first seated themselves inside the restaurant what he heard, their experience probably would have been limited to being greeted by a Waffle House waitress attempting to serve them. Under these circumstances, the court concludes that the only individual who was arguably denied service as a result of the offensive remark was Mr. Lander. As a result, the court concludes that with the exception of Mr. Lander, Waffle House's motion must be granted with respect to the § 1981 claims filed by Lavonna Eddy, Vernon Eddy and Kathy Lander.

### 2. 42 U.S.C. § 2000a

█ This conclusion also extends to plaintiffs' § 2000a claim.[4] It is well recog-

nized that "[t]he same *prima facie* test as applies in § 1981 cases applies to claims under § 2000(a)." *Charity,* 1999 WL 544687, *5 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Accordingly, for the reasons stated above, the court concludes that only Mr. Lander maintains a cognizable claim against Waffle House under § 2000a.

#### b. Plaintiffs' State law claims: S.C.Code Ann. § 45–9–10 & S.C.Code Ann. § 45–9–30

Plaintiffs' state law claims parallel their federal civil rights claims. The court's conclusion with respect to Mr. Lander and the other plaintiffs applies to these claims as well. Summary judgment is therefore granted against all plaintiffs with the exception of Mr. Lander.

#### c. Plaintiffs' claims for punitive damages and injunctive relief

Lastly, Waffle House argues that plaintiffs' request for both punitive damages and injunctive relief are unavailable as a matter of law because plaintiffs "lack standing to seek injunctive relief and have not satisfied their burden of proof to seek punitive damages." (Def.'s Mem. in Supp. at 20). The court agrees with plaintiff that there is no need to address these arguments at this juncture. Therefore, to the extent that summary judgment is sought on these two issues against Mr. Lander, it is denied.

---

4.  42 U.S.C. § 2000a states in pertinent part that, "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or natural origin." 42 U.S.C. § 2000a(c). In order to establish a claim under this section, a plaintiff must al-

### IV. Conclusion

For the reasons stated above it is therefore **ORDERED** that defendant's Motion for Summary Judgment is **GRANTED** with respect to Lavonna Eddy, Vernon Eddy and Kathy Lander.

**IT IS FURTHER ORDERED** that defendant's Motion for Summary Judgment is **DENIED** with respect to Mark Lander.

**AND IT IS SO ORDERED.**

---

lege that: (1) the restaurant affects commerce; (2) the restaurant is a public accommodation; and (3) the restauranteur denied the plaintiff full and equal enjoyment of the restaurant. *Bobbitt,* 19 F.Supp.2d at 521. Only declaratory and injunctive relief are available, however, under this statute. *Evans v. Holiday Inns, Inc.,* 951 F.Supp. 85 (D.Md. 1997).