# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1918

_____

| | | |
|---|---|---|
| Rodney Green; Charlan Green, | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Dillard's, Inc., | * | |
| | * | |
| Defendant - Appellee. | * | Appeal from the United States |
| | * | District Court for the Western |
| _____ | * | District of Missouri. |
| | * | |
| National Association for the | * | |
| Advancement of Colored People, | * | |
| Kansas City Branch, | * | |
| | * | |
| Amicus on Behalf | * | |
| of Appellants. | * | |

_____

Submitted: December 15, 2006
Filed: April 5, 2007

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Rodney and Charlan Green, an African American couple, brought this action against the retailer Dillard's Inc. under 42 U.S.C. § 1981, which provides that all

persons shall have the equal right "to make and enforce contracts." The Greens allege that they were prevented from closing a purchase by the discriminatory conduct of a Dillard's employee who refused to wait on them and called them "Fucking niggers." The district court granted Dillard's motion for summary judgment, and the Greens appeal. We reverse and remand.

## I.

There was considerable discovery in this case from which we relate the evidentiary background. We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. Wells v. SCI Mgmt., L.P., 469 F.3d 697, 700 (8th Cir. 2006).

On August 11, 2002, Rodney and Charlan Green went to the Dillard's store in the Metro North Mall in Kansas City, Missouri to buy a handbag, purse, and watch for Charlan. They went directly to the watch counter in the accessories section where watches were displayed in a locked display case. Although there were two clerks in the section, neither approached the Greens who looked at the watches in the glass case for about ten minutes while waiting to be helped. One of the clerks was leaning against a wall with her arms folded, and Charlan went up to her and asked, "Ma'am, can you help us?" The clerk was Linda McCrary, and she said "No" to Charlan and continued to stand in the same position. The Greens testified that they were stunned by her response and immediately turned to leave the store, but the other clerk in the section, Veronica Aguero, yelled, "Ma'am, I'll help you when I'm finished here." Aguero was helping other customers at the time so the Greens waited at the purse counter. Although McCrary was still in the accessories department, she made no move to help the Greens while they waited.

When Aguero came over to the purse counter to assist the Greens, McCrary followed. She stood by the register with her arms crossed and glared at the Greens

while they looked at the merchandise. With Aguero's help, Charlan selected a purse, a matching wallet, and a key chain to buy. When she saw this, McCrary loudly asked Aguero, "Are they getting all that? How are they paying for it?" Aguero said nothing in response and Rodney wrote a check to Dillard's in the amount of $555.62 to pay for the items. Aguero asked for identification, then accepted the check and rang up the sale. Throughout this transaction McCrary kept staring at the Greens and muttering under her breath.

After his check was accepted, Rodney asked McCrary, "Ma'am, there's other people, can you help somebody else?" McCrary answered, "I can, but I'm not." Rodney was offended by McCrary's behavior and asked Aguero to call a manager. After putting their selections in a bag, Aguero asked the Greens if there was anything else they were interested in buying. Charlan said that she would like to purchase a wristwatch. Aguero and Charlan then went to the nearby watch counter.

Rodney stayed behind at the register where the Greens had made their purchases. McCrary also remained there with an "even more intent" hostile expression on her face according to Rodney. An uncomfortable silence followed so he pulled out his identification and credit cards and laid four credit cards on the counter to show McCrary he was a bona fide customer. He told her, "Ma'am I don't have to steal anything. I can buy anything in the store I like. I have four platinum cards here." He added that he was a police officer. McCrary approached the counter on which Rodney had laid his credit cards, looked at the cards, and said, "Platinum. Huh." Then she stepped back and said, "Fucking niggers" and stalked off. Being called "niggers" made Rodney feel as if he had been physically assaulted and treated as less than human. He felt unable to remain in the store or to make any further purchases "after being called the most heinous name in the world."

Meanwhile Charlan and Aguero had returned from the watch counter in order to get the keys for the watch case. They both heard McCrary's epithet. Charlan

testified that she felt humiliated and publicly embarrassed by McCrary's words and conduct. Aguero apologized and told the Greens that "she [McCrary] had been disciplined for this before."

It was at this point that a Dillard's sales manager, Amanda Andreasen, arrived. She approached Rodney and asked what was going on. Rodney informed her what had happened and what McCrary had said to them. Andreasen apologized several times and said that Dillard's had "had problems with [McCrary] with this before." While Andreasen and the Greens were talking, Andreasen received a phone call. As she listened to the caller, Andreasen's face colored and tears came to her eyes. After the conversation ended she told the Greens, "That was one of the customers that overheard what was said."

The Greens testified that they were so upset by the incidents with McCrary that they were unable to complete their intended purchase of the watch. Rodney also told Andreasen they wanted to return the items they had already purchased. Andreasen returned his check and the Greens left the store. The next day Andreasen and assistant store manager Anita Harrold called McCrary into a disciplinary meeting and fired her. The paperwork which Andreasen filled out in order to document the termination stated that McCreary had been "muttering comments about the customer" and "was rolling her eyes and making undertones of some prejudice [sic] remark." Two days after the incident the manager of the store, David Bousum, called Rodney and then Charlan about it. Bousum indicated to both that McCrary had been "disciplined for this before" and had now been discharged. Bousum offered the Greens a 20% discount on their next purchase, but they declined it. Bousum later sent the Greens a letter of apology that renewed the same discount offer.

In August 2004 the Greens brought this action, alleging that Dillard's had violated § 1981 by interfering with their rights to make and enforce contracts. Documents and testimony were produced in discovery which showed that McCrary

had worked at Dillard's for about five months before she was fired and had been subjected to disciplinary action prior to the incidents with the Greens. On August 8, 2002, McCrary had received a written warning from assistant store manager Anita Harrold about rude behavior to a customer who wanted to buy a $300 handbag, as well as to another customer who was writing a check. Although McCrary was required by Dillard's policies to sign the written warning, she refused to do so but no further action was taken. Harrold testified that she was aware that McCrary had received verbal warnings in the previous months about the way in which she treated customers, but she did not remember the race of the complaining customers. There was also testimony that at the Metro North Dillard's, oral reprimands were not recorded or placed on file and that Dillard's had no company wide policy on such warnings.

On McCrary's employment application at Dillard's she had listed two past employers. She indicated that she had worked as a business sales representative for AT&T from 1979 to 2000 with a salary of more than $40,000 per year. McCrary claimed she left the job due to "downsizing" and listed her other employment as two months at K-Mart, where she had been a "straightner/stocker [sic]" at $8.50 per hour before being "laid off" in December of 2000. Anita Harrold could not recall whether the references which McCrary provided had been contacted. Bousum could not remember whether he was involved in hiring McCrary, but he did not think her application would have raised any concerns about her employment history.

Plaintiffs deposed store manager David Bousum as well as Paul Schroeder, general counsel for Dillard's. Both were asked about their knowledge of a recent § 1981 case resulting in a large judgment against another Dillard's store in the greater Kansas City metropolitan area. See Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091 (10th Cir. 2001) (affirming $1.1 million verdict). Bousum said he knew about it only from news reports, but general counsel Schroeder testified that he had met with leaders in the Kansas City community regarding their concerns about the case.

Schroeder could not specify any steps Dillard's had taken to prevent discrimination against customers, and he was aware of no policy requiring that customer complaints be documented or maintained for any period of time. Aside from a written harassment policy, the antidiscrimination training of Dillard's employees is limited to a one hour videotape during their orientation. The orientation session also covers training on security and shoplifting, and Aguero testified that the entire orientation lasts about a week.

Schroeder testified that he did not know what training was available to assist store managers in applying Dillard's written policy against harassment or how an investigation into alleged harassment or discipline of an offender would or should be conducted. Bousum was also questioned about the use of the "N word" by a former district manager of Dillard's, Richard Eagan, in reference to a black employee, but Bousum could not recall his reaction to the incident. When Bousum was asked whether Eagan's calling a Dillard's employee a nigger made him question whether the man should have been in a management position, Bousum replied, "sitting here right now, I don't believe it would."

Bousum testified that there was a sign with a photograph of Bousum on it posted at the doors to the Metro North Dillard's informing customers, "If your shopping experience is not up to your expectations, please let me or our management staff know." Each Dillard's store was supposed to provide "customer comment cards" for customers to fill out with their complaints or concerns. Andreasen testified that associates receive training on how to handle customer complaints on their first day of work, but Aguero said that she received no training on how to handle customer complaints and was never given "customer comment cards" to hand out to customers. There was testimony that these cards were kept at several different counters throughout the store. Bousum puts these complaints and his written responses to those complaints in a file that he empties and discards every three to six months. Harrold could not recall any meetings among the managers about responding to customer complaints.

Dillard's moved for summary judgment, arguing that the Greens had failed to show that it had actionably interfered with a contract interest of theirs. In granting Dillard's motion, the district court observed that the Greens had completed their purchases of the purse, wallet, and key chain before McCrary used the racial slur against them and concluded that they no longer had a contract interest in those items. It also concluded that McCrary's personal refusal to help the Greens purchase the watch which Charlan wished to buy did not make out a § 1981 case against Dillard's. The Greens appeal, and the Kansas City Branch of the NAACP has filed an amicus brief in support.

On appeal, the Greens contend that the district court erred in granting summary judgment to Dillard's because they established a prima facie case and there were disputed issues of fact preventing summary judgment. Dillard's argues in turn that the Greens were not denied any contractual right since other employees were willing to help the Greens and there was no evidence that Dillard's intended to discriminate against them.

II.

Section 1981(a) guarantees that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." In reaction to what it perceived as the Supreme Court's restrictive interpretations, Congress added § 1981(b) to the statute in 1991. That subsection more fully defines the right "to make and enforce contracts" as "includ[ing] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

To establish a prima facie case of discrimination in the retail context, a § 1981 plaintiff must show (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, and (3) interference by the defendant with an activity

protected under the statute. Bediako v. Stein Mart, Inc., 354 F.3d 835, 839 (8th Cir. 2004). We review de novo the district court's grant of summary judgment to Dillard's, viewing the evidence in the light most favorable to the Greens and making all reasonable inferences in favor of them. Hossaini v. W. Mo. Med. Ctr., 140 F.3d 1140, 1142 (8th Cir. 1998). Summary judgment is appropriate only if the evidence, viewed in this way, demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.

There is no dispute that the Greens are members of a protected class and that the first factor of the prima facie test is satisfied. Section 1981 "does not provide a general cause of action for race discrimination," Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001), however, and plaintiffs must show they had a protected contractual relationship or interest. Daniels v. Dillard's, Inc., 373 F.3d 885, 887 (8th Cir. 2004), citing Bediako, 353 F.3d at 839.

The addition of § 1981(b) extended the statute's protections "to all phases and incidents of the contractual relationship," Rivers v. Roadway Express, Inc., 511 U.S. 298, 302 (1994), specifically and precisely including "the making ... of contracts," and the language of § 1981(a) is itself very broad. See Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 437 (4th Cir. 2006). As the First Circuit has explained, § 1981 reaches "beyond the four corners" of a contract into the contracting process. Garrett v. Tandy Corp., 295 F.3d 94, 100 (1st Cir. 2002). In the retail context, § 1981 plaintiffs are required to demonstrate that they actively sought to enter into a contract with the retailer. Williams v. Staples, Inc., 372 F.3d 662, 667-68 (4th Cir. 2004); Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 872 (6th Cir. 2001). There must have been "some tangible attempt to contract," Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 752 (5th Cir. 2001), such as a demonstrated interest in specific items which the defendant has held out for sale. Cf. Morris v. Office Max, Inc., 89 F.3d 411, 414 (7th Cir. 1996) (no evidence that plaintiffs were interested in merchandise).

Since the Greens had completed their purchase of the purse, wallet, and key chain, thus making the contract for them, they no longer had an interest in forming a contract as to those items, see Youngblood, 266 F.3d at 854-55, but the issue is different in respect to the wristwatch which Charlan wanted to buy. The contracting process began as she looked at the watches in the display case and selected which one she was interested in. The process then continued as she communicated to Aguero her desire to purchase that watch. Charlan testified that when the Greens entered Dillard's, they had proceeded first to the watch counter where she determined which watch she wanted to buy. When Aguero asked whether there was anything else the Greens wanted after their initial purchases, Charlan replied that she wanted "to get the watch." She asked Aguero to get the key to the display case where the watches were kept, and she and Aguero were on their way to get it when they heard McCrary's racial insult. The Greens thus produced evidence from which a jury could reasonably find that Charlan had selected a specific item to buy and in fact had clearly communicated to Aguero that she intended to purchase it.

Under § 1981 contract formation begins and the statutory protections are triggered once a customer has made "some tangible attempt to contract" by selecting particular items for sale. Morris, 277 F.3d at 752. In a retail setting "[e]ach time a customer takes an item off the shelf, a new contract looms." Garrett, 295 F.3d at 100; see also Christian, 252 F.3d at 874 (plaintiff had selected items and put them in her shopping cart). Here Charlan was unable to pick up the watch since it was locked in a case, but the testimony of the Greens would permit a finding that she would have taken possession of it if the ongoing transaction had not been thwarted by McCrary's conduct. It is intent to purchase, not physical possession, that is needed to create a contractual interest. See Denny, 456 F.3d at 435 (in § 1981 action against beauty salon contractual interest created by customer's telephone conversation with receptionist about buying hair coloring for her mother). We conclude that there is a genuine issue of fact as to whether the Greens had a contractual interest protected by § 1981, and as to whether they were prevented from making the contract for the watch.

In order to prevail in their § 1981 case the Greens must also show actionable interference with their contractual interest. <u>Daniels</u>, 373 F.3d at 887. At oral argument counsel stated that the Greens would have liked to have had an "enjoyable shopping experience," but the "enjoyment" protected by the statute is the "exercise of a right." <u>See</u> Black's Law Dictionary 571 (8th ed. 2004). The right protected by § 1981 is the right of individuals like the Greens to the same benefits and privileges of contractual relationships as white shoppers. In this case the Greens have produced evidence that goes beyond bad manners, isolated rudeness, or neglect of a customer. Their evidence includes not only a most egregious racial slur, but also a series of actions which a trier of fact could find as a whole thwarted their attempt to make and close a contract with Dillard's for the wristwatch.

Here, there is evidence that McCrary explicitly refused service to the Greens when they first approached her, discouraged her coworker from assisting them by questioning their ability to pay, and treated them at all times with pronounced hostility while rejecting Rodney's request to leave them alone. No other employee reproached her or tried to stop her behavior, and the manager requested by Rodney Green did not appear until after McCrary had left the section in a huff. Although other Dillard's employees were more civil to the Greens, a jury could reasonably find that McCrary's acts of refusing service, interfering with the attempts of another employee to help them, and culminating in a forceful racial insult were enough to thwart the Greens' ability to complete their purchase. McCrary did not merely refuse to serve the Greens personally; she actively hindered Aguero's service as well. <u>Cf.</u> <u>Bagley v. Ameritech Corp.</u>, 220 F.3d 518, 521 (7th Cir. 2000) (manager personally hostile to black customer but facilitated service from another employee). We conclude there is a genuine issue of fact as to whether the Greens suffered actionable interference with their rights under § 1981.

The final element the Greens must prove is discriminatory intent. They have produced substantial evidence as to the frame of mind of Dillard's employee Linda McCrary. While direct evidence is not necessary to raise a reasonable inference of

discriminatory intent, calling customers "niggers" is direct evidence of discrimination. See Ross v. Douglas County, 234 F.3d 391, 393, 397 (8th Cir. 2000); Brown v. E. Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993). The Greens have produced direct evidence of discriminatory intent, but Dillard's argues that it cannot be held vicariously responsible for McCrary's actions.

Similar arguments have been rejected elsewhere. In Arguello v. Conoco, Inc., 207 F.3d 803, 810 (5th Cir. 2000), the Fifth Circuit held under general agency principles that a retailer can be liable under § 1981 for the actions of its nonsupervisory employees when they are acting within the scope of their duties. See also Solomon v. Waffle House, Inc., 365 F. Supp. 2d 1312, 1328-29 (N.D. Ga. 2004); Eddy v. Waffle House, Inc., 335 F. Supp. 2d 693, 701 (D.S.C. 2004). The significant number of summary judgments denied or final judgments upheld against retailers based on actions of their nonsupervisory employees is also worthy of note.[1]

Our court has never had occasion to adopt a liability standard for a retail employer whose employees are alleged to have violated § 1981 because in our past cases the plaintiffs failed to establish a prima facie case. See Bilello v. Kum & Go, L.L.C., 374 F.3d 656, 660 (8th Cir. 2004); Daniels, 373 F.3d at 887; Bediako, 354 F.3d at 839; Youngblood, 266 F.3d at 854. In Daniels the issue was recognized but

---

[1]See Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091 (10th Cir. 2001); see also Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427 (4th Cir. 2006); Williams v. Staples, Inc., 372 F.3d 662 (4th Cir. 2004) ; Christian v. Wal-Mart Stores, Inc., 252 F.3d 862 (6th Cir. 2001); Buchanan v. Consol. Stores Corp., 125 F. Supp. 2d 730 (D. Md. 2001); Halton v. Great Clips, Inc., 94 F. Supp. 2d 856 (N.D. Ohio 2000) (denying motion to dismiss as to one customer, granting it as to others); McCaleb v. Pizza Hut of Am., Inc., 28 F. Supp. 2d 1043 (N.D. Ill. 1998); Malone v. Schenk, 638 F. Supp. 423 (C.D. Ill. 1985) (discussing vicarious liability under § 1981 and rejecting argument against it).

not resolved since the plaintiffs had not made a showing of discriminatory treatment.[2] In a footnote we questioned whether a retailer could be held liable under respondeat superior for the "actions of an unidentified sales clerk," see Daniels, 373 F.3d at 888 n.4, commenting as much about the failure of the plaintiffs to produce evidence as about the unbriefed and unanswered issue of employer liability.

In the case before the court the issue of employer liability cannot be deferred, and we must address it in the context of the evidence brought forward by the parties. While there is here no evidence of discriminatory policies or discriminatory acts by managers for which Dillard's could be held accountable, plaintiffs have made out a prima facie case of negligence. Under agency law an employer is directly liable for harm resulting from his own negligent or reckless conduct. See, e.g., Restatement (Second) of Agency § 213 & cmts.

The Greens have produced evidence from which a trier of fact could find that Dillard's kept McCrary on its sales floor to deal with customers even though it had reason to know that McCrary's hostile propensities could lead to incidents like the Greens experienced. Several employees, including her supervisor and the store manager, told the Greens that Dillard's had disciplined McCrary "for this" or that McCrary had had problems "with this" in the past. Whether "this" referred to racist behavior is a question of fact on this record, but the inference that McCrary had displayed racially discriminatory tendencies in the past is not inconsistent with the other evidence. While Aguero testified that one of the incidents for which McCrary had been reprimanded involved a white woman, neither McCrary's personnel file nor the testimony of the deponents indicate the race of the other customers who complained.

---

[2]From the record we concluded that the principal plaintiff's check had only been rejected because of a computer error and that she had not produced evidence to show that an item she was interested in was available at a discount.

A jury could also infer that inaction by Dillard's contributed to the incident. There is evidence that Dillard's lacked procedures to remedy discrimination toward customers, did not consistently keep records of complaints, and employed managers who did not take prompt corrective action against discrimination. Dillard's also apparently did not inquire into unexplained anomalies in McCrary's employment history when she applied for a job at its store. After being purportedly "downsized," McCrary moved from a relatively high paying job at AT&T to an unskilled position at Kmart. Kmart employed her for only two months and laid her off in the month of December when the holiday shopping season would presumably increase Kmart's demand for labor.

We conclude that plaintiffs have produced sufficient evidence to raise a jury issue about whether Dillard's knew or should have known of McCrary's racially hostile propensities and not only failed to take reasonable measures to stop it, but continued to place McCrary on the sales floor and authorize her to interact with customers. See Restatement (Second) of Agency § 213. There is also evidence in the record from which Dillard's may argue to the jury that it was not negligent. Dillard's had in place an employee training program and a procedure to handle employee disciplinary problems, it disciplined McCrary for rude behavior, it had posted signs in the store informing customers about a complaint procedure, and other employees were courteous to the Greens and apologized for McCrary's behavior.

## III.

Since there are material issues of fact on the elements required to make out a case under § 1981, the district court erred in granting summary judgment to Dillard's. For these reasons we reverse the judgment and remand the case for trial.

_____