**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-11280

DENISE ARGUELLO, ALBERTO GOVEA,
GARY IVORY, ANTHONY PICKETT, MICHAEL ROSS,
for themselves and all others similarly situated;
MANUEL ESCOBEDO, MARTHA I. ESCOBEDO,

Plaintiffs-Appellants,

versus

CONOCO, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

April 10, 2000

Before POLITZ, DAVIS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The appellants, a group of Hispanic and African-American consumers, filed suit against appellees, Conoco, Inc. ("Conoco" or "Conoco, Inc.") alleging that they were subjected to racial discrimination while purchasing gasoline and other services. Appellants challenge the district court's 12(b)(6) dismissal of their disparate impact claim under 42 U.S.C. § 2000a, and the district court's grant of summary judgment to Conoco on the appellants remaining 42 U.S.C. §§ 1981 and 2000a claims. For the following reasons we affirm in part, and reverse in part.

FACTUAL AND PROCEDURAL BACKGROUND

There are three different incidents which form the background for this appeal. In March 1995, Denise Arguello ("Arguello"), and her father Alberto Govea ("Govea"), along with various

other members of their family stopped at a Conoco-owned store[1] in Fort Worth, Texas. After pumping their gasoline Arguello and Govea entered the store to pay for the gasoline and purchase other items. When Arguello approached the counter she presented the store cashier, Cindy Smith ("Smith"), with her items and a credit card. Smith asked to see Arguello's identification. When Arguello gave Smith her Oklahoma driver's license Smith stated that an out-of-state driver's license was not acceptable identification. Arguello disagreed with Smith and Smith began to insult Arguello using profanity and racial epithets.[2] Smith also knocked a six-pack of beer off the counter toward Arguello. After Arguello retreated from the inside of the store, Smith used the store's intercom system to continue yelling racial epithets. Smith also made obscene gestures through the window.

Moments after the incident occurred Arguello and Govea used a pay phone outside the station to call a Conoco customer service phone number and complain about Smith's conduct. Govea also attempted to reenter the store to discover Smith's name. When Govea attempted to reenter the store, Smith and another store employee locked the doors. Linda Corbin ("Corbin"), a district manager, received Arguello and Govea's complaints. Corbin reviewed video tape from the store, which had no audio, and concluded that Smith had acted inappropriately. When she was confronted by Corbin, Smith admitted to using the profanity, racial epithets, and obscene gestures. Corbin counseled Smith about her behavior but did not suspend, or terminate Smith. Several months after the incident Corbin transferred Smith to another store for Smith's protection after receiving phone calls that a group was planning to picket the store at which the incident took place.

---

[1] We will use the term "Conoco-owned" to denote stores that are owned and operated by Conoco, Inc. "Conoco-branded" stores are stores which are independently owned marketers of Conoco products and are subject to the Petroleum Marketer Agreements.

[2] These racial epithets included "f***ing Iranian bitch", and "go back to where you came from you poor, f***ing Mexicans."

In September 1995, Gary Ivory ("Ivory"), Anthony Pickett ("Pickett"), and Michael Ross ("Ross") visited a Conoco-branded store in Fort Worth, Texas. While inside the store they allege that they were followed by a store employee and after complaining about this treatment a store employee told them "we don't have to serve you people" and "you people are always acting like this." The employee refused to serve them and asked them to leave. Eventually the police were summoned and the policeman ordered the store employee to serve the group.

In November 1996, Manuel Escobedo ("Escobedo") and Martha Escobedo ("Mrs. Escobedo") stopped at a Conoco-branded store in San Marcos, Texas. Escobedo claims that while visiting this store the store employee refused to provide toilet paper for the restroom, shouted profanities at his wife, and said "you Mexicans need to go back to Mexico." Escobedo called Conoco to complain about this incident, and was told by a Conoco customer service supervisor, Pamela Harper, that there was nothing Conoco could do because that station was not owned by Conoco. In a separate incident at a Conoco-branded store in Grand Prairie, Texas Escobedo was allegedly told by the store clerk that "you people steal gas." Finally, Escobedo claims that at two Conoco-branded stores in Laredo, Texas he was required to pre-pay for his gasoline while Caucasian customers were allowed to pump their gas first and then pay.

In March 1997, Arguello, Govea, the Escobedos, Ivory, Pickett, and Ross ("plaintiffs" or "appellants") filed suit against Conoco, Inc. on behalf of themselves and all other similarly situated parties.[3] The plaintiffs alleged that Conoco was in violation of 42 U.S.C. §§ 1981[4] and 2000a ("Title II")[5] and state law for refusing to serve Hispanic and African-American customers, and

---

[3] In the Plaintiffs' Fourth Amended Complaint they dropped all claims made on behalf of the class.

[4] 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to full and equal benefit of all laws...as is enjoyed by white citizens."

[5] Title II states that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation...without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a.

subjecting this class of customers to substandard service and racially derogatory remarks. The plaintiffs also claimed that Conoco had illegal policies and practices which disparately impacted Hispanics and African-Americans.

In July 1997, the district court issued an order dismissing all claims based on the plaintiffs' allegations of disparate impact and the plaintiffs' state law claims. In October 1998, the district court granted summary judgment to Conoco on all of the plaintiffs' remaining claims.

DISCUSSION

Appellants raise several issues on appeal. First, appellants contend that the district court erred in finding no agency relationship between Conoco, Inc. and the Conoco-branded stores. Appellants also argue that the district court erred in finding no agency relationship between Conoco, Inc. and Cindy Smith because Smith acted outside the scope of her employment. Appellants argue in the alternative that even if Smith was outside the scope of her employment Conoco had a non-delegable duty to prevent racial discrimination, and further that Conoco should be held liable because it ratified Smith's conduct. Finally, appellants contend that the district court improperly dismissed their disparate impact claims under Title II. We will consider each of these issues in turn.

A.     Standard of Review

This court reviews a grant of summary judgment de novo. Neff v. American Dairy Queen Corporation, 58 F.3d 1063, 1065 (5th Cir. 1995). Summary judgment should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We review the facts drawing all inferences most favorable to the party opposing the motion. Neff, 58 F.3d at 1065 (quoting Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986)).


B.     Agency Relationship between Conoco, Inc. and Conoco-branded Stores

4

The incidents involving Ivory, Ross, Pickett and the Escobedos occurred at Conoco-branded stores. These Conoco-branded stores are independently owned, and have entered into Petroleum Marketing Agreements ("PMA") that allow them to market and sell Conoco brand gasoline and supplies in their stores. The district court held that no agency relationship existed between Conoco, Inc. and the Conoco branded stores. The district court found that Conoco, Inc. did not control the details of the daily operations of the Conoco branded stores, including personnel decisions.

The Supreme Court has suggested that in order to impose liability on a defendant under § 1981 for the discriminatory actions of a third party, the plaintiff must demonstrate that there is an agency relationship between the defendant and the third party. General Building Contractors Association v. Pennsylvania United Engineers and Constructors, 458 U.S. 375,393, 102 S.Ct. 3141, 3151-52, 73 L.Ed.2d 835 (1982). Agency is a fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. Id. at 391 (citing Restatement (Second) of Agency § 1 (1958) ("Restatement")). At the core of agency is a "fiduciary relation" arising from the "consent by one person to another that the other shall act on his behalf and subject to his control...equally central to the master-servant relation is the master's control over or right to control the physical activities of the servant." Id. at 393 (citing Restatement §1). Therefore, to establish an agency relationship between Conoco, Inc. and the branded stores the plaintiffs must show that Conoco, Inc. has given consent for the branded stores to act on its behalf and that the branded stores are subject to the control of Conoco, Inc.

Appellants argue that the PMAs establish that Conoco, Inc. has an agency relationship with the branded stores. They argue that the PMAs give Conoco, Inc. control of the branded stores because the PMAs require the branded stores to maintain their businesses according to the standards set forth in the PMAs. Plaintiffs further contend that Conoco, Inc. controls the customer service dimension of the Conoco-branded stores. As evidence the plaintiffs point to a

statement in the PMA that instructs the branded stores that "all customers shall be treated fairly, honestly, and courteously." Furthermore, the plaintiffs assert that Conoco, Inc. has the power to debrand the Conoco-branded stations for not complying with the contractual terms of the PMA. Thus, because of this debranding power the plaintiffs reason that Conoco controls the operations of their brand marketers in all areas which are discussed in the PMA, including customer service. The plaintiffs also produced summary judgment evidence that Conoco, Inc. conducts random, bi-yearly inspections of the branded stores to determine if business is being conducted in accordance with the standards of the PMA.[6]

Despite the plaintiffs' interpretation of the PMAs and the evidence of inspections, the plain language of the PMA defines the relationship between Conoco, Inc. and its branded stores. The PMA states:

> Marketer [Conoco branded store] is an independent business and is not, nor are its
> employees, employees of Conoco. Conoco and Marketer are completely separate entities.
> They are not partners, general partners...nor agents of each other in any sense whatsoever
> and neither has the power to obligate or bind the other.

The facts of the present case are similar to the facts which formed the basis of the claim in Neff v. American Dairy Queen Corporation, 58 F.3d 1063 (5th Cir. 1995). In Neff, the plaintiff appealed summary judgment of her claims against American Dairy Queen Corporation ("ADQ") for violation of the Americans with Disability Act ("ADA"). Neff claimed that ADQ violated the ADA by failing to make its San Antonio stores wheel chair accessible. Id. at 1064. We held that ADQ was a franchisor and the franchise agreement specifically stated that ADQ did not own or operate the San Antonio stores. Id. at 1068. The only summary judgment evidence presented by Neff was the franchise agreement. Neff argued that contrary to franchise agreement's statement disclaiming operation of the franchisee establishments, other clauses in the franchise agreement

---

[6] These inspections normally focus on product displays and labeling. Customer service is not considered a main focus of the random inspections.

demonstrated that ADQ did in fact "operate" the San Antonio stores. Id. at 1065. Neff did not allege that the franchise agreement was ambiguous, instead she disputed whether the control over franchisee facilities which was provided for in the agreement made ADQ an "operator." Id. at 1065. The franchise agreement stated that the franchise building should be constructed and equipped in accordance with the ADQ's specifications, and that the building should be maintained in accordance with the ADQ's requirements. Id. at 1066. We held that this language in the franchise agreement "[did] not establish sufficient control on ADQ's part such that ADQ can be said to "operate" the San Antonio stores." Id. at 1067.

In the present case, our review of the record and pleadings do not reveal any allegation by the plaintiffs that the language in the PMA is ambiguous as to its meaning. The clauses of the PMA which state that the franchisee's business operations should be conducted in a consistent manner with the standards of Conoco, Inc., and that customers should be treated fairly and courteously are similar to the language of the franchise agreement in Neff which required that building specifications be approved by the franchisor. See also, Perry v. Burger King Corporation, 924 F.Supp. 548 (S.D.N.Y. 1996) (granting summary judgment to defendant based on franchise agreement which defined franchisee as an independent contractor, and plaintiff presented no evidence that franchisor had policies regarding franchisee employees). The language of the PMA, while offering guidelines to the Conoco-branded stores, does not establish that Conoco, Inc. has any participation in the daily operations of the branded stores nor that Conoco, Inc. participates in making personnel decisions.

Therefore, we find that there is no agency relationship between Conoco, Inc. and the branded stores in question, and that Conoco, Inc. as a matter of law cannot be held liable for the unfortunate incidents which happened to Ivory, Pickett, Ross, and the Escobedos at the Conoco-branded stores.

C.      Scope of Employment

7

Arguello and Govea complain of discriminatory treatment at a Conoco-owned store. Appellants argue that the district court erred in finding that Conoco could not be held liable under Title II, 42 U.S.C. § 2002e-2[7], or 42 U.S.C. § 1981[8], for the acts of its store clerk, Smith. The district court found that as a matter of law there was no agency relationship between Smith and Conoco because Smith's acts of discrimination towards Arguello and Govea were outside the scope of Smith's employment.

In Flanagan, this Court considered whether agency principles applied to an employment discrimination suit alleging racial discrimination and seeking relief under both 42 U.S.C. § 1981 and Title VII. Flanagan v. A.E. Henry Comm. Health Svcs. Ctr., 876 F.2d 1231, 1233 (5th Cir. 1989). We held that the doctrine of respondeat superior applied under § 1981[9] to render the employer liable for the discriminatory acts of the plaintiff's supervisors. Id. at 1236 (relying on the Supreme Court's implication, in General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 392, 102 S.Ct. 3141, 3151-52, 73 L.Ed.2d 835 (1982), that agency principles apply under § 1981). In Flanagan, we did not foreclose the possibility that an employer must respond in damages for the acts of a non-supervisor. Id. Conoco does not dispute that we must apply agency principles in determining liability under § 1981. However, Conoco cites a recent Supreme Court decision holding that courts may not hold an employer vicariously liable for the

---

[7] 42 U.S.C. § 2000a provides, in relevant part "[a]ll persons shall be entitled to full and equal enjoyment of the goods, services, facilities, privileges, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."

[8] 42 U.S.C. § 1981 provides, in relevant part, "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens."

[9] As the district court noted in its opinion, a plaintiff must prove purposeful discrimination under § 1981. See Patterson v. McClean Credit Union, 491 U.S. 164, 186, 109 S.Ct 2363, 2377, 105 L.Ed.2d 132 (1989) (citing General Bldg. Contractors, 458 U.S. at 391, 102 S.Ct. at 3150). A successful § 1981 plaintiff may be entitled to compensatory and punitive damages. Under Title II the only relief is injunctive. Therefore, we see no reason that vicarious liability standards under § 1981 should not also be applicable to Title II.

discriminatory actions of non-supervisory employees.  Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

In Faragher, the plaintiff brought a sexual harassment action under Title VII claiming sexual discrimination in the "terms, conditions, and privileges" of her employment.  Faragher, 524 U.S. at 781, 118 S.Ct. at 2280.  The Court held that an employer is subject to vicarious liability for the discriminatory actions of supervisory employees where the employer undertakes tangible employment action, discharge, demotion, or undesirable reassignment.  Id. at 807, 118 S.Ct. at 2293.  The Court further held that when no tangible employment action is taken such as in a hostile environment sexual harassment action, "a defending employer may raise an affirmative defense[10] to liability or damages ...."  Id. at 807-08, 118 S.Ct at 2293.  The Supreme Court explained that:

> [w]hen a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker.  When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose 'power to supervise–[which may be]–to hire and fire, and to set work schedules and pay rates–does not disappear ... when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion.

Id. at 803, 118 S.Ct. at 2291.

Conoco argues that we should follow Faragher and hold that Conoco is not vicariously liable for the actions of Smith, a non-supervisory employee.  Alternatively, Conoco argues that even if it has some responsibility for Smith's acts it is entitled to assert an affirmative defense as outlined by the Court in Faragher, by showing at trial that it was not negligent.  It points to the lack of evidence indicating prior harassment by Smith that would have notified Conoco of her

---

[10] "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

9

behavior so that Conoco could have had an opportunity to fashion a remedy. We disagree with Conoco's arguments.

The Supreme Court in Faragher recognized that in an action based on discrimination in the workplace whether the discriminating party is a supervisor is all-important. The supervisor controls the career of the employee under his supervision. The offended employee cannot rebuke the supervisor, laugh at the supervisor, or walk away from the supervisor as she could from a fellow employer. In a public accommodation case such as this, the supervisory status of the discriminating employee is much less relevant than it is in an employment discrimination case. Smith subjected Arguello and Govea to discrimination that was just as harmful as if the discriminatory acts had been committed by one of Conoco's supervisory employees. We are therefore not persuaded that the Supreme Court would apply the same restricted vicarious liability rule in this public accommodation context as it did in Faragher, involving discrimination in the workplace.

Also, in a public accommodation case under § 1981, a rule that only actions by supervisors are imputed to the employer would result, in most cases, in a no liability rule. Unlike the employment context it is rare that in a public accommodation settings a consumer will be mistreated by a manager or supervisor. Most consumer encounters are between consumers and clerks who are non-supervisory employees.

In City of Chicago v. Matchmaker Real Estate Sales Center, Inc., 982 F.2d 1086, 1089 (7th Cir. 1992), cert. denied, 508 U.S. 972, 113 S.Ct 2961, 125 L.Ed.2d 662 (1993), plaintiff sued a real estate company under the Fair Housing Act and § 1982, a companion statute to § 1981. One of the questions presented in the case was whether the real estate company was responsible for the discriminatory acts of its employees, who engaged in illegal racial steering. Id. at 1096-97. The court, applying the Restatement (Second) of Agency, held that the real estate company was responsible for the acts of these non-supervisory employees. Id. at 1098. For all of

10

these reasons, we are persuaded that the restrictive rules of respondeat superior, applied in Faragher, do not apply to this case.

Under general agency principles a master is subject to liability for the torts of his servants while acting in the scope of their employment. See Restatement § 219. Some of the factors used when considering whether an employee's acts are within the scope of employment are: 1) the time, place and purpose of the act; 2) its similarity to acts which the servant is authorized to perform; 3) whether the act is commonly performed by servants; 4) the extent of departure from normal methods; and 5) whether the master would reasonably expect such act would be performed. Domar Ocean Transportation Ltd. v. Independent Refining Company, 783 F.2d 1185, 1190 (5th Cir. 1986) (citing Prosser and Keeton, The Law of Torts 502 (5th ed. 1984); Restatement § 228.

First, we must consider the time, place and purpose of Smith's actions. Smith's behavior toward Arguello and Govea occurred while she was on duty inside of the Conoco station where she was employed. The plaintiffs also put forth summary judgment evidence that Smith asked Arguello to present identification for credit card purchases. The purpose of Smith's interaction with Arguello was to complete the sale of gas and other store items. The initial confrontation and subsequent use of racial epithets occurred while Smith was completing Arguello's purchase of her items and processing the credit card transaction.

Second, we must consider whether Smith's actions were similar to those she was authorized by Conoco to perform. The sale of gasoline, other store items, and the completion of credit card purchases are the customary functions of a gasoline store clerk. The plaintiffs presented summary judgment evidence that Smith also used the intercom, which is also a customary action of gasoline store clerks.

Third, we will examine the extent of Smith's departure from normal methods. It is self-evident that Smith did not utilize the normal methods for conducting a sale. There was no summary judgment evidence presented that Conoco expected or anticipated that Smith would

11

perform her functions in this manner. The appellees would have this court adopt the position that because Smith's use of racial epithets is comparable to the commission of an intentional tort, Conoco should not be held liable for Smith's behavior. However, the fact that an employee engages in intentional tortious conduct does not require a finding that the employee was outside the scope of his employment. Domar, 783 F.2d at 1190 (citing Restatement § 231). In Domar, we found that a captain of a tanker vessel who stole crude oil and sold the oil was within the scope of his employment when he committed the theft and sale. Id. This court found that the captain's illegal actions took place while he was serving as master of the vessel and that the illegal transaction was similar to other transactions he had authority to perform. Id. We correctly concluded that although the captain's employer did not expect the captain to steal the cargo, that factor was outweighed by the other considerations. Id. In the present case, although Conoco could not have expected Smith to shout racial epithets at Arguello and Govea, Smith's actions took place while she was performing her normal duties as a clerk. Conoco, Inc. had authorized Smith to interact with customers as they made purchases. Therefore, although Smith did depart from the normal methods of conducting a purchase this does not lead to the conclusion that as a matter of law she was outside the scope of her employment.

Finally, we must consider whether Conoco could have reasonably expected Smith to act in a racially discriminatory manner. There is no evidence in the record on this prong of the test. However, we note that even if Conoco is able to show that they could not have expected this conduct by Smith, the jury is entitled to find that the other factors outweigh this consideration. Domar, 783 F.2d at 1190.

In assessing whether Smith was within the scope of her employment the district court found that the only summary judgment evidence presented by the plaintiffs was that Smith was working in her job as cashier when the offensive behavior occurred. The district court concluded that the summary judgment evidence was insufficient to "overcome the common-sense conclusion" that Smith's offensive actions were not within the scope of her employment.

12

However, we reject the presumption that because Smith behaved in an unacceptable manner that she was obviously outside the scope of her employment. See Domar, 783 F.2d at 1190. The plaintiffs did present summary judgment evidence that Smith was on duty as a clerk, and that she was performing authorized duties such as conducting sales. This summary judgment evidence is not insignificant. Smith's position as clerk, and her authorization from Conoco to conduct sales allowed her to interact with Arguello and Govea, and put Smith in the position to commit the racially discriminatory acts. The plaintiffs also presented summary judgment evidence that Smith used her authority to conduct credit card transactions and use the gas station intercom system to commit the acts in question.

It is also important to note that Conoco does not challenge whether this incident occurred. Smith admitted to a Conoco district manager that she did subject Arguello and Govea to the use of racial epithets, profanity, and obscene gestures. The only dispute is whether there is a legal remedy for Arguello and Govea by holding Conoco liable for Smith's actions. The plaintiffs contend that the inference that should be drawn from Smith's actions is that Smith was authorized by Conoco to perform the actions of a clerk and that this meant that her actions while on duty as clerk were within the scope of her employment. Conoco, utilizing the same facts asks us to draw the inference that because Smith was acting on personal racial bigotry and animosity that she was outside the scope of her employment.

This court has repeatedly held that when the basic facts of a case are undisputed and the parties disagree about the material factual inferences that may be drawn from these facts summary judgment may be improper. See Winters v. Highlands Insurance Company, 569 F.2d 297, 299 (5th Cir. 1978). Summary judgment is appropriate when a party fails to "make a showing sufficient to establish the existence of an element essential, to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Cartrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The plaintiffs in the present case do bear the burden of proof to establish the existence of an agency relationship between Smith and Conoco. See Karl Rove & Co. v. Thornburg, 39 F.3d 1273, 1296 (5th Cir. 1994). To establish an agency relationship between Smith and Conoco the plaintiffs must establish that Smith was within the scope of her employment when she committed the racially discriminatory acts against Arguello and Govea. See Restatement § 319. The factors for establishing scope of employment were outlined in Domar. As we have discussed *supra* it is clear that the plaintiffs have presented summary judgment evidence regarding these factors. Therefore, the plaintiffs have met the standard set forth in Celotex, and summary judgment should not have been granted in favor of Conoco.

D.    Non-Delegable Duty

Appellants argue in the alternative that even if Smith was outside the scope of her employment Conoco should still be held liable because it had a non-delegable duty not to discriminate against minority consumers. A master is not subject to liability for the torts of his employees acting outside the scope of their employment, unless: 1) the master intended the conduct or consequences, 2) the master was negligent or reckless, or 3) the conduct violated a non-delegable duty of the master, or 4) the employee purported to speak on behalf of the principal. Restatement § 219(2). The argument that an employer has a non-delegable duty under § 1981 not to discriminate has been largely foreclosed by the Supreme Court in General Building Contractors, 458 U.S. at 395. In General Building Contractors, the Supreme Court stated that § 1981 is meant to prohibit employers from intentional discrimination and not intended to make them guarantors of rights against all third parties. See General Building Contractors, 458 U.S. at 396. Therefore, it follows that the duty not to discriminate is not a non-delegable duty, instead a plaintiff must establish a close connection between the employer and the third party who engages in the intentional discrimination.

14

Plaintiffs also argue in the alternative that Conoco ratified the actions of Smith by not suspending or firing her. In order for an employer to be found to have ratified the actions of an employee the employer must know of the act and adopt, confirm, or fail to repudiate the acts of its employee. See generally, Prunty v. Arkansas Freightways, Inc., 16 F.3d 649, 653-54 (5th Cir. 1994). In the present case, after Conoco was notified of Smith's actions, a customer service supervisor, Linda Corbin, told Arguello and Govea that she agreed that Smith had acted inappropriately and she counseled Smith about her behavior. While Conoco did not fire or suspend Smith, it does not appear that Conoco ratified Smith's actions.

E.     Disparate Impact Claims under Section 2000a

Appellants argue that the district court erred in finding that as a matter of law the plaintiffs could not state a claim for redress under 42 U.S.C. § 2000a ("Title II") based on a disparate impact theory. The district court found that the language of Title II evidences an intent to prohibit only intentional discrimination and that disparate impact claims are not cognizable under Title II. However, the district court offered no authority to support that proposition. Neither the Supreme Court nor this court has addressed the question of whether disparate impact claims are cognizable under Title II. Furthermore, the law in the other circuits is generally unclear as to whether disparate impact claims are recognized under Title II.[11]

In the present case, even assuming arguendo that disparate impact claims are cognizable under Title II, the plaintiffs did not establish a prima facie case of discrimination of the type

---

[11] See Stephen E. Haydon, A Measure of Our Progress: Testing for Race Discrimination in Public Accommodations, 44 UCLA L. Rev. 1207, 1220 n.47 (1997). There are cases in which courts have acknowledged disparate impact theories in Title II cases. See e.g., Robinson v. Power Pizza, Inc., 993 F.Supp. 1462, 1464-65 (M.D. Florida 1997) (parties agreed and court applied disparate impact analysis in Title II claim); Olzman v. Lake Hills Swim Club, 495 F.2d 1333, 1340 (2d Cir. 1974) (using disparate impact analysis in case against social club in which plaintiffs challenged facially neutral club guest policy).

required in disparate impact claims.[12]   The plaintiffs failed to allege that there was a specific

Conoco policy which had a negative disparate effect on minority customers. The plaintiff's

complaint contains general allegations that Conoco's policies and or practices though neutral on

their face have a disparate impact on black and Hispanic persons.  In their original complaint and

subsequent amended complaints plaintiffs failed to identify any specific Conoco policy that had a

discriminatory effect.  Furthermore, the plaintiffs also failed to provide a specific allegation that

any Conoco practice or policy was having an effect on an identified class of Conoco's consumers.

The plaintiffs' complaints set forth facts regarding approximately six specific incidents of racially

discriminatory treatment, but do not establish any widespread or general effect on minority

consumers.  During discovery it was shown that in a two year period Conoco received between

ten and twenty complaints which alleged racial discrimination.  Therefore, because the plaintiffs'

allegations could not support a disparate impact claim, we decline to decide whether disparate

impact claims are generally cognizable under Title II.  We conclude that the district court properly

granted the motion to dismiss under 12(b)(6) for failure to state a claim upon which relief can be

granted.

## CONCLUSION

We hold that the district court did not err in finding that no agency relationship existed

between Conoco, Inc. and its branded stores, and properly entered summary judgment against the

Escobedos, Ivory, Pickett, and Ross.  We also affirm the district court's dismissal of the plaintiffs'

disparate impact claims for failure to state a claim upon which relief could be granted.  We reverse

the district court's determination that Cindy Smith acted outside the scope of her employment as a

matter of law and remand for further proceedings consistent with this opinion.

AFFIRMED in part, and REVERSED in part.

---

[12] In disparate impact claims the plaintiff must first establish that there is neutral policy or practice that has had a discriminatory impact on a particular group.  See e.g., Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1972); Simms v. First Gibraltor Bank, 83 F.3d 1546, 1555 (5th Cir. 1996).