# United States Court of Appeals for the Federal Circuit

-------------------

## IN RE:  VOLKSWAGEN GROUP OF AMERICA, INC.,
*Petitioner*

-------------------

2022-108

-------------------

On Petition for Writ of Mandamus to the United States District Court for the Western District of Texas in No. 6:20-cv-01131-ADA, Judge Alan D. Albright.

-------------------------------------------------

## IN RE:  HYUNDAI MOTOR AMERICA,
*Petitioner*

-------------------

2022-109

-------------------

On Petition for Writ of Mandamus to the United States District Court for the Western District of Texas in No. 6:20-cv-01125-ADA, Judge Alan D. Albright.

-------------------

## ON PETITION

-------------------

MARK A. HANNEMANN, Shearman & Sterling LLP, New York, NY, for petitioner Volkswagen Group of America, Inc. Also represented by AHMED ELDESSOUKI, ERIC SEBASTIAN LUCAS, THOMAS R. MAKIN.

RYAN KEN YAGURA, O'Melveny & Myers LLP, Los

Angeles, CA, for petitioner Hyundai Motor America.  Also represented by CLARENCE ROWLAND, NICHOLAS WHILT.

MICHAEL SONGER, White & Case LLP, Washington, DC, for respondent StratosAudio, Inc.  Also represented by HENRY HUANG, HALLIE ELIZABETH KIERNAN, JONATHAN J. LAMBERSON, Palo Alto, CA; DANIEL STERNBERG, Boston, MA.

MARK S. DAVIES, Orrick, Herrington & Sutcliffe LLP, Washington, DC, for amicus curiae Alliance for Automotive Innovation.  Also represented by ALEXANDRA BURSAK, New York, NY.

Before DYK, REYNA, and CHEN, *Circuit Judges*.

PER CURIAM.

# O R D E R

Volkswagen Group of America, Inc. (Volkswagen or VW) and Hyundai Motor America (Hyundai or HMA) (collectively, the "Petitioners") both seek a writ of mandamus to vacate the United States District Court for the Western District of Texas's denial of their motions to dismiss or transfer for improper venue.  The district court held venue was proper over each car distributor under 28 U.S.C. § 1400(b).  The court based that conclusion on the presence of independently owned and operated Volkswagen or Hyundai car dealerships in the Western District of Texas, determining those independent dealerships constituted "a regular and established place of business" of the Petitioners.  § 1400(b).  Because there has been disagreement on this issue in the district courts, we deem it appropriate to now take up the issue.  We conclude that the district court clearly abused its discretion in failing to properly apply established agency law and reaching a patently erroneous result.  We therefore grant both petitions.

## I.

In December 2020, StratosAudio, Inc. (Stratos) filed these patent infringement complaints in the United States District Court for the Western District of Texas, Waco Division, against Volkswagen and Hyundai, car distributors that are incorporated in New Jersey and California, respectively, and hence do not "reside[]" for venue purposes in the Western District.  28 U.S.C. § 1400(b); *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514 (2017). Volkswagen and Hyundai moved to dismiss or transfer the cases under 28 U.S.C. § 1406(a) and Federal Rule of Civil Procedure 12(b)(3).

The district court denied the motions, concluding that venue in the Western District over Volkswagen and Hyundai was proper.  It reached that conclusion based on independent car dealerships located in the Western District that sell and service cars after purchasing them from the Petitioners under franchise agreements imposing, inter alia, transfer restrictions, staffing and reporting requirements, minimum inventory levels, employee training, and equipment requirements on the dealerships.  The district court concluded those agreements gave the Petitioners sufficient control over the dealership locations to establish a regular and established place of business of the Petitioners despite the fact that Texas law prohibits auto manufacturers and distributors from directly or indirectly "operat[ing] or control[ling] a franchised dealer or dealership."  Tex. Occ. Code (TOC) § 2301.476(c)(2)(A).

In so doing, the district court found that the agreements give Petitioners sufficient control over dealership operations such that the dealerships are agents of the distributors.  *See* 2022-108 Appx (VW Appx) 8–10; 2022-109 Appx (HMA Appx) 397–99.  Based on similar facts, the district court found that Petitioners had ratified the dealerships as their own places of business.  *See* VW Appx 4–8; HMA Appx 391–97.  Additionally, the district court determined that the dealerships are conducting Petitioners' business because Volkswagen and Hyundai are "in the business of manufacturing and distributing vehicles to

consumers" and "the only way that [Volkswagen and Hyundai] can distribute [their] vehicles to consumers in this District is through [their] authorized dealerships in this District." VW Appx 10; HMA Appx 399. It similarly found the dealerships conducted Petitioners' business of providing "new purchase warranties and services to the consumers through [their] dealerships," VW Appx 10; HMA Appx 399, and in the case of Volkswagen, "establish[ing] the procedures for processing warranty claims and returning and disposing of defective parts," "requir[ing] its dealers to comply with such procedures," and "determin[ing] the rate or price at which a . . . dealer will be reimbursed for services," VW Appx 10.

Volkswagen and Hyundai each petitioned this court for a writ of mandamus. The two cases are now consolidated in this court. Both present similar challenges to the district court's conclusions that the dealerships are Petitioners' agents, that Petitioners ratified the dealerships as their own places of business, and that Petitioners' business is conducted from the dealership locations. Volkswagen asks us to vacate the denial of its motion and instruct the district court to dismiss or transfer the action to the United States District Court for the Eastern District of Michigan. Hyundai asks the court to direct dismissal of its case.

## II.

### A.

Pursuant to the All Writs Act, this court "may issue all writs necessary or appropriate in aid of [our] respective jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Before a court may issue a writ, three conditions must be satisfied: (1) the petitioner must have "no other adequate means to attain the relief he desires"; (2) the petitioner must show that the right to the writ is "clear and indisputable"; and (3) the court "in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004) (citation and internal quotation marks omitted).

Ordinarily, mandamus relief is not available for rulings on motions under 28 U.S.C. § 1406(a). *See In re HTC Corp.*, 889 F.3d 1349, 1352–53 (Fed. Cir. 2018) ("Unlike a defendant challenging the denial of a § 1404(a) transfer motion, a defendant aggrieved by the denial of an improper-venue motion has an adequate remedy on appeal from a final judgment."). However, "[m]andamus may be used in narrow circumstances where doing so is important to 'proper judicial administration,'" *In re Micron Tech., Inc.*, 875 F.3d 1091, 1095 (Fed. Cir. 2017) (quoting *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259–60 (1957)), such as when there are "a significant number of district court decisions that adopt conflicting views on the basic legal issues presented in th[e] case" at hand, *In re Google LLC*, 949 F.3d 1338, 1342 (Fed. Cir. 2020) (*Google II*). Here, given the disagreement among district courts on the recurring issue of whether independent car dealerships are sufficient to establish venue over car distributors, *compare Omega Pats., LLC v. Bayerische Motoren Weke AG*, 508 F. Supp. 3d 1336 (N.D. Ga. 2020) (finding venue improper); *W. View Rsch., LLC v. BMW of N. Am., LLC*, Case No. 16-cv-2590, 2018 WL 4367378 (S.D. Cal. Feb. 5, 2018) (same), *with Arigna Tech. Ltd. v. Volkswagen AG*, Case No. 2:21-cv-00054-JRG, Dkt. Nos. 415 & 424 (E.D. Tex. Jan. 18 & 20, 2022) (report and recommendations finding venue proper)[1]; *Blitzsafe Tex., LLC v. Bayerische Motoren Werke AG*, Case No. 2:17-cv-00418-JRG, 2018 WL 4849345 (E.D. Tex. Sept. 6, 2018), *vacated*, 2019 WL 3494359 (E.D. Tex. Aug. 1, 2019) (same)), we determine that these cases

---

[1]    In a related case involving similar venue considerations, the same district court has stayed the proceeding to "gain the benefit of [the] guidance" provided herein. *Arigna Tech. Ltd. v. Bayerische Motoren Werke AG*, Case No. 2:21-cv-00172, Dkt. No. 179 at 2 (E.D. Tex. Feb. 1, 2022) [hereinafter *Arigna '172*].

6                IN RE: VOLKSWAGEN GROUP OF AMERICA, INC.

involve exceptional circumstances warranting immediate review.[2]

## B.

The burden to establish venue in patent infringement cases rests with the plaintiff. *See Westech Aerosol Corp. v. 3M Co.*, 927 F.3d 1378, 1382 (Fed. Cir. 2019). Whether venue is appropriate in a patent infringement action is unique to patent law and therefore Federal Circuit law applies. *See Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1119 n.4 (Fed. Cir. 2021); *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017).

Section 1400(b) provides, in relevant part, that "[a]ny civil action for patent infringement may be brought in the judicial district where . . . the defendant has committed acts of infringement and has a regular and established place of business." The regular and established place of business inquiry has three general requirements:

---

[2]   The at least four disparate inter-district determinations on the specific issue presented here, in combination with a district court staying another case "until the Federal Circuit issues further guidance on the[se] venue issues," *Arigna '172*, distinguishes the instant case from *In re Google LLC*, No. 2018-152, 2018 WL 5536478, at *3 (Fed. Cir. Oct. 29, 2018) (*Google I*). *Google I* declined to entertain a venue challenge where there were only a "paucity of district court cases that ha[d] so far addressed the issue," such that there was not, at the time, "almost-even disagreement among a large number of district courts" warranting the extraordinary remedy of mandamus. *Id.* The circumstances present here are more akin to *Google II*, where the court exercised its discretion to provide guidance on the same issue present in *Google I*, based on the intervening two years producing "a significant number of district court decisions that adopt conflicting views" that "crystallized and brought clarity to the issues." *Google II*, 949 F.3d at 1342–43. The inter- and intra-district uncertainty on this issue thus warrants mandamus review in this case.

"(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *Cray*, 871 F.3d at 1360. The second *Cray* factor requires "the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" *Google II*, 949 F.3d at 1345. We consider whether these requirements are met with the understanding that the Supreme Court has repeatedly cautioned against a broad reading of the patent venue statute. *See Schnell v. Peter Eckrich & Sons, Inc.,* 365 U.S. 260, 264 (1961); *Stonite Prods. Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 566 (1942).

Petitioners do not challenge that Stratos has adequately alleged infringement within the Western District for venue purposes. And Petitioners do not dispute that the dealership locations are physical places within the Western District. Nor do they dispute that those physical places are regular and established places of business for the dealerships. The dispute thus boils down to three issues: (1) whether the dealerships are the agents of Petitioners; (2) whether the dealerships conduct Petitioners' business; and (3) whether Petitioners have ratified the dealerships as Petitioners' places of business. "If any [of these] statutory requirement[s] [are] not satisfied, venue is improper under § 1400(b)." *Cray*, 871 F.3d at 1360.

## C.

We hold that the dealerships located in the Western District do not constitute regular and established places of business of Volkswagen and Hyundai under § 1400(b) because Stratos has failed to carry its burden to show that the dealerships are agents of Volkswagen or Hyundai under a proper application of established agency law.[3]

---

[3] Because Stratos has failed to show that an agent or employee of the Petitioners conducts business at the dealerships we need not address whether the dealerships

Per *Google II*, "a 'regular and established place of business' requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" 949 F.3d at 1345.  Stratos does not argue that Petitioners' employees work out of the individual dealerships or that the individual dealership employees are agents of Petitioners. *See* Stratos VW Br. 9; Stratos HMA Br. 9.  Rather, Stratos argues, and must therefore prove, that the dealership entities themselves are Petitioners' agents.  *See Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359 (Fed. Cir. 2016) (*PG&E)* ("The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence." (quoting Restatement (Third) of Agency (Restatement) § 1.02(d))).

As we noted in *Google II*:

An agency relationship is a fiduciary relationship that arises when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act.  Restatement (Third) of Agency § 1.01.  The essential elements of agency are (1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act.  Meyer v. Holley, 537 U.S. 280, 286, 123 S. Ct. 824, 154 L.Ed.2d 753 (2003).

949 F.3d at 1345 (internal quotation marks and alteration brackets omitted).  *Google II* emphasized that the control required in an agency relationship is one of "interim

---

conduct Petitioners' business by selling cars to consumers or providing warranty services or whether the dealership locations can be considered the places of business of Petitioners.  *Google II*, 949 F.3d at 1346; *Cray*, 871 F.3d at 1360.

control." *Id.* at 1345–46 ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services by persons who are not agents." (citing Restatement § 1.01(f)(1))). *Google II* further recognized that agency relationships are narrow in scope. *Id.* at 1346. That is, just because a party may be a principal's agent for a particular purpose does not mean that the party is the principal's agent for another. *See* Restatement § 1.01(c) ("Only interactions are within the scope of an agency relationship affect the principal's legal position.").

*Google II*'s analysis is instructive for each of these points. In *Google II*, the plaintiff alleged that Internet Service Providers (ISPs) who hosted Google's servers were Google's agents because the ISPs were contractually required to install and maintain the servers in addition to providing them with network access. *See* 949 F.3d at 1345–46.

As to providing network access, *Google II* determined that the ISPs were merely "provid[ing] Google with a service, and Google has no right of interim control over the ISP's provision of network access beyond requiring that the ISP maintain network access to the . . . servers and allow the . . . servers to use certain ports for inbound and outbound network traffic." *Id.* at 1345. The lack of interim control over how the ISPs performed this contractual duty meant "[i]n this respect, the ISPs are not the agents of Google." *Id.* (citation omitted).

In contrast, the installation and maintenance provisions of the contract between Google and the ISPs required the ISPs to perform certain discrete tasks "based on information and instructions provided from Google," or "only with specific and direct step-by-step instructions by Google." *Id.* at 1346 (citations omitted). Although the additional, specific control by Google may have been "suggestive of an agency relationship" with respect to those tasks, *id.*, the court did not need to decide that question because the one-off installations could not be considered "regular and established," *see id.* And the "maintenance activities

cannot, standing alone, be considered the conduct of Google's business." *Id.* The ISPs, therefore, were not Google's agents for venue purposes for these activities either.

*Google II* thus distinguishes between contractual provisions potentially evidencing interim control (step-by-step directions for maintenance and installation) and those that merely provide constraints on how a service is provided (e.g., network access). Stated differently, *Google II* recognizes that an agency relationship requires the "principal ha[ve] the right throughout the duration of the relationship to control the agent's acts." *PG&E*, 838 F.3d at 1360 (quoting Restatement § 1.01(c)). And the "fact that such an agreement imposes constraints on the service provider does not mean that the service recipient has an interim right to give instructions to the provider. Thus, setting standards in an agreement for acceptable service quality does not of itself create a right of control." Restatement § 1.01(f)(1).

Questions of control often arise in the context of franchise agreements, and courts long have recognized that "[s]ome degree of control by the franchisor over the franchisee would appear to be inherent in the franchise relationship," but "the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship." *See Drexel v. Union Prescription Ctrs., Inc.*, 582 F.2d 781, 786 (3d Cir. 1978). What matters is "the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties." *Id.* (collecting cases); 2 Franch. & Distr. Law & Prac. § 9:42 ("Where a contract establishes an independent contractor relationship rather than an agency relationship and does not grant the principal control over the details of the contractor's work, then evidence must be produced to show that despite the contract terms, a true relationship between the parties gave the principal a right of control.").

*Google II* also stands for the proposition that the control analysis must account for the scope of the alleged agency. In other words, control over one aspect of a party's

or agent's activities does not affect the analysis of whether that party is an agent for a different activity. *See* Restatement § 1.01(c) ("Only interactions that are within the scope of an agency relationship affect the principal's legal position."). For example, when assessing agency based on a contractual relationship, "an agent's duties of performance to the principal are subject to the terms of any contract between them." *Nat'l Plan Adm'rs v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 702 (Tex. 2007) (quoting Restatement § 8.07(a)). An agreement to act on behalf of another "only for specific purposes" does not give rise to a general duty or agency for other purposes. *See id.* at 703. In the franchise context, for example, "the most significant factor to consider is the degree of control that the franchisor maintains over the daily operations of the franchisee or more specifically, the 'manner of performing the very work in the course of which the accident occurred.'" *Kerl v. Rasmussen*, 267 Wis. 2d 827, 839 (Wis. Ct. App. 2003) (quoting *Hart v. Marriot Int'l, Inc.*, 304 A.D.2d 1057, 758 N.Y.S.2d 435, 438 (2003)).

Here, Stratos argues that the dealerships are Hyundai's and Volkswagen's agents for conducting Petitioners' business of (i) selling cars to consumers and (ii) providing warranty services to consumers. Assuming that is a proper characterization of the Petitioners' business in the Western District,[4] Stratos still must show that the Petitioners have

---

[4]    Petitioners argue that their business is to sell cars to dealerships, not consumers. *See* VW Pet. 26 ("VWGoA is in the business of selling vehicles to dealers, not to consumers"); HMA Pet. 25 ("HMA is in the business of selling Hyundai-branded vehicles to independent dealerships across the country."). And while Petitioners appear to concede that part of their business is reimbursing dealers for providing warranty services to consumers, they argue they are not in the business of providing warranty services at the dealership locations. *See* VW Pet. 20–21 ("Reimbursing Texas dealers for warranty service charges, although it

the requisite control over the dealerships with respect to those activities, including the right to provide "interim instructions." *Google II*, 949 F.3d at 1345–46.

Stratos argues that similar contractual provisions in both the Volkswagen and Hyundai dealership agreements give Petitioners the control required for agency. These contractual provisions generally require the dealerships to: (1) employ certain types of employees, such as a general manager, and service and sales staff; (2) maintain a minimum amount of inventory; (3) perform warranty work on consumer vehicles; (4) use specified tools when performing warranty and maintenance work; (5) use distributor-approved computer hardware and software; (6) comply with the distributors' standards regarding dealership appearance and use of signs and brand logos; (7) comply with the distributors' working capital requirements; and (8) attend mandatory training sessions (Hyundai) or require staff to have certain training certifications (Volkswagen).[5] Stratos further argues that the Petitioners' conditional ability to terminate the agreements demonstrates the requisite control for agency.

Petitioners contend that they do not have the right to control the day-to-day operations of the dealerships, *see* HMA Pet. 1, 20, and that the provisions cited above are basic "quality controls" insufficient to find agency, *see* VW Pet. 22. They liken whatever requirements and standards may exist in this case to *Andra Group, LP v. Victoria's*

---

may be considered doing business in the state of Texas, . . . is not doing business at the dealerships for purposes of venue."); HMA Pet. 26 ("There is no evidence suggesting that HMA conducts any warranty or service business at a physical place of business in this district. . . .").

[5] Stratos also cites Volkswagen-specific contract provisions requiring dealerships to use Volkswagen-approved stationery and business forms, and to keep brochures on hand and display them as dictated by Volkswagen. *See, e.g.*, VW Appx 66. These Volkswagen-specific provisions do not alter our analysis in this case.

*Secret Stores, L.L.C.*, 6 F.4th 1283, 1289 (Fed. Cir. 2021), where we found allegations of control by several parent companies over the operations of a retail subsidiary insufficient to create an agency relationship. Petitioners further point to contractual provisions in each franchise agreement with the dealers disclaiming an agency relationship, VW Appx 88; HMA Appx 168, and that state the dealerships have complete authority over their own operations, VW Appx 88; HMA Appx 133. Petitioners also point to TEX. OCC. CODE ANN. § 2301.476(c)(2), which prohibits distributors from "operat[ing] or control[ling]" car dealerships in Texas. Furthermore, TEX. OCC. CODE ANN. § 2301.003(b) states that any contractual provision that violates chapter 2301 is "unenforceable." Thus, according to Petitioners, any interpretation of the agreements to give Petitioners control over the dealerships would make those agreements void and unenforceable as a matter of law.

We need not reach whether the Volkswagen and Hyundai dealership agreements violate Texas law, however, as we determine that the cited contractual provisions fail to give Petitioners "interim control" over either the dealerships' car sales or warranty work. Stratos has not cited any evidence that Volkswagen or Hyundai maintain influence over the sales process once they have sold a car to a dealership. Once the cars leave Petitioners' possession, Petitioners "retain[] no authority over the manner in—or price for—which the [car] will be [sold]." *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278 (2d Cir. 2013); *see also id.* at 279 (finding no agency relationship between consumers and website operator because the consumer "retains no right to instruct Priceline as to how it procures hotel reservations beyond the initial specifications"). At best, Stratos cites various constraints placed on the dealerships that are arguably *related* to sales (minimum inventory, sales staff, displaying the parent company's logo, providing sales reports, etc.), but none of these provisions evidence any control over the sales process itself. These provisions are akin to the constraints placed on the *Google II* ISPs (use of certain ports and maintaining network access) that failed to make the ISPs agents of Google.

949 F.3d at 1345–46; *see also Johnson*, 711 F.3d at 279 ("After the customer . . . delimits the choices that the service provider has the right to make . . . he cedes all other control over the reservation process to Priceline.") (internal citation, quotation marks, and alteration brackets omitted); *Kerl*, 267 Wis. 2d at 839 ("[T]he most significant factor to consider is the degree of control that the franchisor maintains over the . . . manner of performing the very work in the course of which the accident occurred.").

And, unlike *Google II*'s maintenance and installation provisions, there are no "step-by-step" instructions from Petitioners that dealerships must follow when selling a car to a consumer. *See* 949 F.3d at 1346; *Andra*, 6 F.4th at 1289 (taking actions which benefit a separate company does not create an agency relationship unless the alleged principal "controls this process"). Indeed, Stratos has cited no evidence that undermines the franchise agreements' provisions giving the dealerships full control over their day-to-day operations, such as sales. VW Appx 88; HMA Appx 133. Thus, the terms and conditions set forth in the franchise agreements fail to give rise to an agency relationship between the Petitioners and dealerships when it comes to selling cars to consumers. *See Arguello v. Conoco, Inc.*, 207 F.3d 803, 808 (5th Cir. 2000) (finding lack of day-to-day control by franchisor of franchisee's operations and hiring decisions precluded agency finding for alleged customer-service-based harms); *Schear v. Motel Mgmt. Corp. of Am.*, 61 Md. App. 670, 688 (Md. Ct. Spec. App. 1985) (holding that a franchisor's lack of control over the "day-to-day operation" of the franchisee's hotel precluded agency finding with respect to harm caused through allegedly negligent security).

Our holding is further bolstered by the relevant—though not dispositive—consideration that the parties to the franchise agreements disclaim an agency relationship. VW Appx 88; HMA Appx 168; *see also PG&E*, 838 F.3d at 1359 ("[I]t is well established that parties' statements in a contract are not dispositive as to the existence of an agency relationship."); Restatement § 1.02(b) ("Although such statements are relevant to determining whether the

parties consent to a relationship of agency, their presence in an agreement is not determinative and does not preclude the relevance of other indicia of consent.").

This result is further in accord with a near uniform body of case law finding that similar contractual provisions or allegations of control fail to show that independent dealerships are agents of vehicle manufacturers or distributors. *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 290 (5th Cir. 2004) (finding no agency relationship between General Motors and independent local dealership where General Motors did "not control [the dealership's] daily operations"); *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1334, 1335–36 (7th Cir. 1995) (finding no agency relationship between manufacturer and dealer due to an "express[] disavow[al of] an agency relationship" in a sales agreement and where dealer "manage[d] its operations completely independent of supplier" and "ma[de] all of [its] day to day decisions"); *Arnson v. Gen. Motors Corp.*, 377 F. Supp. 209, 212 (N.D. Ohio 1974) ("[T]he weight of authority, including decisions reviewing similar dealer agreements and dealership operations, support the view that a franchised automobile dealer, with regard to the sale of new vehicles, is an independent merchant and not an agent of the manufacturer." (collecting cases)); *Poynor v. BMW of N. Am., LLC*, 441 S.W.3d 315, 322 (Tex. App.–Dallas 2013, no pet.) (finding no agency between a distributor and dealership employee concerning accident that occurred during a test drive, as plaintiff failed to present evidence that distributor "had the right to control [salesperson] or [dealership] during the act resulting in appellants' injuries").

The same is true as to the dealerships' performance of warranty services. The contractual provisions require the dealerships to perform warranty services, which are reimbursed by Petitioners,[6] or require the dealerships to keep

---

[6]    Stratos argues the HMA agreement additionally requires "dealers [to] explain and provide a copy of warranties to customers at the time of sale." Stratos HMA Br. 11

certain parts on hand and use certain tools when performing repairs. But Stratos fails to cite any language giving the Petitioners control over how the dealerships perform warranty services once those parameters are set. Petitioners' lack of "interim control" over how the dealerships perform warranty work again precludes a finding that the dealerships are Petitioners' agents for warranty services. *Google II*, 949 F.3d at 1345–46; *Leon*, 69 F.3d at 1330, 1336 (reimbursement for warranty work insufficient to create agency relationship); *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 744 (2000) (requirements that repairs are to "be done in a prompt and efficient manner, in accordance with Mack's policies and standards, and . . . will utilize only parts manufactured or recommended by Mack[,] . . . are merely reflective of the ordinary desire of manufacturers to set sufficient minimum performance and quality standards to protect the good name of their trademark that they are allowing another to display" and "do not establish, without more, the kind of close control . . . that would indicate that Vigor was serving as Mack's agent for the work" (cleaned up)).

In contrast, the cases cited by the district court and Stratos are distinguishable procedurally and factually. In *Morano v. BMW of N. Am., LLC*, 928 F. Supp. 2d 826 (D.N.J. 2013), the court denied BMWNA's motion to dismiss because it found the plaintiff's allegations of agency

---

(citing HMA Appx 147). But the provision Stratos cites does not require dealerships to provide and explain HMA warranties. Rather, "DEALER agrees that, if it sells or installs any part or accessory that is *not* a Hyundai Genuine Part or Accessory, . . . Dealer will clearly explain to the Customer the extent of any [third-party] warranty covering the equipment, part or accessory involved and will deliver a copy of such warranty to the Customer at the time of sale." HMA Appx 147 (emphasis added). As Stratos does not allege that HMA's business includes providing consumers third-party parts or warranty service, this provision does not bear on the instant analysis.

plausible. *Id.* at 838 ("If BMWNA is the entity that made the decision whether to cover certain losses—conveying that decision through the local dealer—it stands to reason that the dealer acted as BMWNA's agent, or at least that the two acted together."). Accordingly, we do not read *Morano* as finding "that the dealer acted as BMWNA's agent," as the district court did. *See* VW Appx 9–10; HMA Appx 398. Further, the specific allegation in *Morano*—that BMWNA itself made the decision to decline Mr. Morano's requested warranty service and instructed the dealership accordingly—is an allegation that BMWNA exerted *interim control* over the warranty process in that instance.

*Stevens v. Ford Motor Co.*, Case No. 2:18-CV-456, 2020 WL 12573279 (S.D. Tex. Nov. 2, 2020), and *Kent v. Celozzi-Ettleson Chevrolet, Inc.*, Case No. 99 C 2868, 1999 WL 1021044 (N.D. Ill. Nov. 3, 1999), have both also been invoked for the unremarkable proposition that independent dealerships may, in some circumstances, be considered agents of distributors or manufacturers. *See* VW Appx 9–10; HMA Appx 397–98; Stratos HMA Br. 29. We can hardly disagree that when a distributor or manufacturer exercises the requisite level of control over a dealership for certain activities—control not present here for sales or warranty service—that an agency relationship can exist. That is why the district court in *Morano* allowed the plaintiffs to take discovery as to whether BMWNA controlled the specific warranty rejections at issue. And why *Stevens*, which similarly involved allegations of a defective part, declined to dismiss a case where Ford was alleged to have "multiple controls over advertising and warranty and repair work." 2020 WL 12573279, at \*6. Unsurprisingly, *Kent* also declined to dismiss a claim against General Motors because, "[t]hough it may be unlikely that Kent will be able to establish that General Motors made Celozzi-Ettleson its agent with respect to the sale of extended warranties, . . . it is not out of the question that she will be able to do so." 1999 WL 1021044, at \*4.

In light of the above, we conclude that Stratos has failed to carry its burden to show that the dealerships with the Western District are agents of either Volkswagen or

Hyundai under a proper application of established agency law.

\*   \*   \*

For these reasons, we conclude the district court's venue conclusions were a clear abuse of discretion for erroneously interpreting governing law and reaching a patently erroneous result. The district court declined to dismiss or transfer based entirely on its determination that the independent car dealerships in the Western District of Texas constituted regular and established places of business of Volkswagen and Hyundai. Because we reverse the only basis for the district court's decisions to keep these cases in the Western District of Texas, we remand for the district court to now address whether to dismiss or transfer these two cases.

Accordingly,

IT IS ORDERED THAT:

The petitions for a writ of mandamus are granted, the district court orders denying the motions to dismiss or transfer are vacated, and the case is remanded for further proceedings consistent with this order.

FOR THE COURT

March 9, 2022                    /s/ Peter R. Marksteiner
     Date                          Peter R. Marksteiner
                                   Clerk of Court